# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **VELMA SUE BATES, CLAUDIA BIRDYSHAW, WILLARENE FISHER, MARK LONG, JON TOUNGETT, CAROLYN WADE, and RICHARD WHITE,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 1:08-0029** |
| | ) | **Judge Trauger** |
| **v.** | ) ) | |
| **DURA AUTOMOTIVE SYSTEMS, INC.,** | ) ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Several motions are pending before the court in this employment discrimination case. First, the defendant Dura Automotive Systems, Inc. ("Dura"), has filed separate motions to dismiss the claims of two of the individual plaintiffs, Mark Long and Claudia Birdyshaw. (Docket Nos. 34 and 48, respectively.) Dura has also filed a Motion for Summary Judgment as to all claims brought by all of the plaintiffs. (Docket No. 58.) Finally, the plaintiffs have also brought a Motion for Summary Judgment on their claims. (Docket No. 63.) For the reasons set forth herein, Dura's motions to dismiss will be denied, Dura's Motion for Summary Judgment will be granted in part and denied in part, and the plaintiffs' Motion for Summary Judgment will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs are seven former Dura employees who all worked at Dura's Lawrenceburg,

1

Tennessee manufacturing facility (the "Facility"), and who were all terminated by Dura.[1] Employees at the Facility manufacture glass window units for cars, trucks, and buses, using, among other things, heavy pieces of glass, metal frames, and rubber molding and adhesives. In doing this work, the employees perform a wide range of jobs, from working with high temperature injection molds and cutting machines to painting primer on metal frames. Indeed, over the course of their employment, the seven plaintiffs performed a variety of jobs at the Facility, including driving a tow motor, assembling windows, and trimming and water testing windows.

In early 2007, managerial officers at the Facility became increasingly concerned that drug use at the Facility was leading to a significantly higher rate of workplace accidents than at comparable plants. Not only were there apparently widespread rumors of drug use at the Facility, but, in early 2007, the Facility experienced two industrial accidents in which the injured employees tested positive in post-accident drug tests. (Docket No. 62 at 2.) At this time and for several years before, the Facility also had substantially more lost time incidents (an industrial accident that causes an employee to miss work due to injury), "OSHA recordable incidents," and worker's compensation expenses than other Dura manufacturing facilities. (*Id.*) Dura concluded that "there was a connection between drug use, whether legal or illegal, and the high incidence of workplace accidents." (Docket No. 61 at 1.)

---

[1]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 60, 65, 67 and 71) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

2

Through early 2007, the policy of the Facility was that an employee could not use legal prescription drugs if such use adversely affected safety, company property, or job performance. Convinced that this policy was not sufficiently protective of workplace safety, however, these Dura officers began to research ways to more comprehensively evaluate which employees at the Facility might be impaired during the work day. Therefore, in early 2007, Dura contacted an independent, third-party drug testing organization known as Freedom From Self ("FFS"), which would assist Dura in implementing a new, comprehensive drug testing program.

Specifically, Lisa Peden from FFS met with Mark Jent, who is a Dura "Safety Specialist," and Lindy Boots, who is the Human Resources Manager for the Facility, to discuss the drug testing program and to determine the type and scope of the testing. Through these discussions, Dura decided that its new drug-testing program for the Facility would test for twelve substances, including those readily found legal prescription drugs. Dura believed that these substances, although legally prescribed, could create a safety risk in a manufacturing environment.

In May 2007, on behalf of Dura, FFS conducted Facility-wide drug testing of the Facility's more than 450 employees. Specifically, each employee was, at a set time, brought into a large room at the Facility, where the employee registered with an FFS representative. (Docket No. 64 at 46.) That representative handed the employee a cup, and the employee went into a controlled environment (a bathroom with no soap or running water) to urinate in the cup. (*Id.*) After so doing, the employee would deliver the cup back to the FFS representative. (*Id.*) At this time, the FFS representative conducted an "initial panel test," which made a preliminary finding as to whether the urine contained any of the twelve substances. The results of the initial panel

3

test were available almost immediately. If the results of the initial panel test were "clean," that is, none of the twelve substances was detected, then the employee was free to return to work. Employees who tested "positive" for any of the twelve substances were deemed to have failed the initial panel test and were generally sent home or asked to remain on site to await further instructions.

FFS followed and directed a set protocol after each initial panel test. First, FFS sent each employee's urine sample to Quest Diagnostics, for confirmatory testing. Quest then sent the results of the confirmatory tests to Dr. Seth Portnoy, who is a licensed medical review officer. Dr. Portnoy reviewed the confirmatory test results. If Dr. Portnoy saw that an employee tested positive for a substance found in legal prescription drugs, he would contact the employee to determine if there was a medical explanation for the positive result. If the employee provided a valid medical explanation (and documentation, such as his prescription), Dr. Portnoy changed the final, confirmed result of the drug test from "positive" to "negative." Dr. Portnoy sent the final, confirmed results for all employees back to FFS, which forwarded the results to Dura.

From Dura's perspective, however, all of this confirmatory testing was essentially irrelevant. If an employee failed the initial panel test, Dura ordered the employee to meet with FFS and present to FFS a list of all of the prescription medications that the employee was taking. After meeting with the employee, FFS sent Dura the employee's list of prescription medications and the warnings associated with them. Boots, in consultation with other senior managers at the Facility, then determined, for each employee, which of the medications listed had warnings about the operation of equipment or machinery or impaired mental alertness while using the medication ("adverse warnings"). Identifying these medications as prohibited, Boots then sent

4

the employee a letter advising that Dura was placing the employee on a thirty-day leave of absence, to allow the employee an opportunity to transition to other drugs that Dura perceived as less risky or to stop using the drugs altogether.

This policy was utterly inflexible; that is, after receiving the letter from Boots, several employees (plaintiffs in this case) obtained letters from their physicians stating that the employee's medications would not affect work performance and were necessary for the employee's health and functioning. These letters had no affect on Dura's treatment of the matter. As Jent said in his affidavit, Dura's policy was "any employee, regardless of age or health status, taking drugs for any reason that carried warnings about the operation of equipment or machinery or impaired mental alertness were not allowed to work at Dura until he/she discontinued use of the prohibited drug." (Docket No. 62 at 2.)

If an employee failed the May 2007 Facility-wide test, that employee was permitted to re-test within 30 days, and, if the second initial panel test was "clean," then the employee was free to return to work. If the employee failed a second initial panel test, then that employee was placed on an indefinite layoff and automatically terminated six months later. In the summer of 2007, Dura implemented random and "post layoff return to work" drug screening. If an employee failed an initial panel test during this random or "post layoff return to work" drug screening, the employee could be immediately terminated.

Each of the seven plaintiffs are former Dura employees who, at one time or another, failed an initial panel test because he or she was taking a legally prescribed prescription drug that contained one of the twelve banned substances. Each of the plaintiffs' "positive" initial panel tests was later reversed by Dr. Portnoy to a "confirmed negative," due to the plaintiffs'

documented medical need for the prescription drugs.  To be clear, Dura does not claim that any of the plaintiffs was taking illegal drugs, and Dura recognizes that the plaintiffs' positive initial panel tests were caused by the plaintiffs' use of legal, properly proscribed prescription drugs.

Plaintiff Velma Sue Bates suffers from depression, bipolar disorder, back pain and ADHD.  While at Dura, Bates might miss a couple of days of work per month due to her depression.  That said, with the aid of medication, Bates was able to perform her essential job functions at Dura at the time she was terminated, and she is readily able to perform tasks such as housecleaning, shopping, cooking, babysitting, and walking.  Dura's employment records reflect that, in 2003, 2005, and 2006, Bates filed claims for short-term disability benefits, either related to undisclosed conditions or due to her depression, and she returned to work following each leave, apparently missing no more than a few weeks of work each time.  (Docket No. 64 Ex. A at 34-37.)  Bates never had any safety violations while on her prescribed medications while working at Dura.

Bates failed the May 2007 Facility-wide initial panel test.  Subsequently, in her required meeting with FFS, Bates revealed that she had a prescription for Oxycodone, a prescription drug with an adverse warning.  Pursuant to Dura policy, Bates was placed on the thirty-day leave of absence.  Bates returned to work and passed the initial panel test on June 18, 2007 and was, therefore, permitted to return to work.  In August 2007, Bates took a voluntary layoff.  When she returned from the voluntary layoff in October 2007, Bates was subject to a "post layoff return to work" initial panel test, which was positive for a banned substance.  On the basis of this October 2007 initial panel test, Bates was terminated on October 10, 2007.

Plaintiff Claudia Birdyshaw suffers from back pain.  Dura's employment records reflect

that, in 2003, following a car accident, Birdyshaw filed a claim for leave under the Family and Medical Leave Act (FMLA) and a claim for short-term disability benefits, and that, in 2007, she filed a claim for short-term disability benefits related to a blood clot that kept her from working for ten days. (Docket No. 64 Ex. B at 42-47.) That said, with the aid of medication, Birdyshaw was able to perform her essential job functions at Dura at the time she was terminated, and she has no lifting restrictions. Birdyshaw never had any safety violations while on her prescribed medications while working at Dura.

Birdyshaw failed the May 2007 Facility-wide initial panel test. Birdyshaw subsequently revealed to FFS that she was taking three prescribed medications, Lortab, Oxycodone, and Xanax, which have adverse warnings. On the basis of these revelations, Birdyshaw was placed on the thirty-day leave of absence. Birdyshaw, partially because of her doctor's advice, did not stop taking these medications, and Birdyshaw was subsequently terminated for failing to submit a clean initial panel test.

Plaintiff Willarene Fisher has had shoulder problems, asthma, shingles, and carpal tunnel syndrome. Dura's employment records reflect that, relatively recently, Fisher missed a substantial amount of time at work due to various ailments and other reasons, including lack of work, and that she only worked about 275 hours in the twelve months leading up to her termination. (Docket No. 64 Ex. C at 39-42.) While there were apparently a variety of reasons (medical and otherwise) for her extended absences, Dura's records reflect that Fisher's shingles did keep her from working for a substantial portion of the early part of 2007. (*Id.* at 38-40, 57-60.) After the shingles improved, with the aid of medication, Fisher was able to perform her essential job functions (including lifting) at Dura at the time she was terminated, although she

reported to her superiors at Dura that her asthma prevented her from working with primer for extended periods of time. Fisher never had any safety violations while on her prescribed medications while working at Dura.

Fisher returned from a leave of absence in June 2007 and failed her "return from leave" initial panel test. Fisher's subsequent meeting with FFS revealed that she had a prescription for Lortab, a pain medication that has an adverse warning. In light of this revelation, Fisher was placed on the thirty-day leave of absence. In July 2007, Fisher passed the initial panel test and was allowed to return to work. In September 2007, in conjunction with a larger layoff at Dura, Fisher was laid off, in large part because she had only worked about 275 hours in the past twelve months. (Docket No. 64 Ex. C. at 45.)

Plaintiff Mark Long suffers from recurring back and shoulder pain. Dura's employment records reflect that, in 2004, he filed for FMLA leave due to an illness; that, in 2005, Long filed for short-term disability benefits related to a surgery and that he reported two repetitive-stress workplace injuries; and that, in 2007, he took less than a month of FMLA leave and that he was reassigned to a different position within the Facility due to "medical reasons." (Docket No. 64 Ex. D at 41-56.) However, with the aid of medication, Long was able to perform his essential job functions, which involved work as a mold operator. Long never had any safety violations while on his prescribed medications when working at Dura.

Long failed the May 2007, Facility-wide initial panel test. Long subsequently revealed to FFS that he had prescriptions for Lortab and Xanax, which have adverse warnings. Due to what Dura terms "an oversight," Long was called back to work and allowed to continue working at the Facility until July 2007, to complete a specialized project on which he had been working. In

8

July 2007, after finishing the project, Long was subject to another initial panel test, which he also failed. At this point, Long was placed on the thirty-day leave of absence. After the thirty-day leave, Long again failed the initial panel test, and he was placed on indefinite layoff status in August 2007 and then terminated six months later.

Plaintiff Jon Toungett has various back ailments that cause him some difficulty in lifting heavy objects, and he suffers from anxiety and depression. Dura's employment records reflect that, in 2006, Toungett had back surgery, missed four months of work, and sought temporary disability benefits for the period of time that he was off from work. (Docket No. 64 Ex. E at 24-29.) Toungett recovered from this surgery, and, with the aid of medication, he was able to perform his essential job functions. Toungett had one safety violation during his eighteen years at Dura.

Toungett failed a random initial panel test administered by Dura in August 2007. A subsequent meeting with FFS revealed that Toungett had a prescription for Xanax, and Toungett was, therefore, terminated shortly after the initial panel test.

Plaintiff Carolyn Wade has diabetes that causes stiffness, but she readily concedes that, with the aid of medication, her illness does not prevent her from working or engaging in most normal activities. Wade is particularly active, enjoying horseback riding amongst other activities. Dura's employment records reflect that, in 2007, Wade sought short-term disability benefits for an eye condition. (Docket No. 64 Ex. F at 69.) Wade never had any safety violations while on her prescribed medications when working at Dura.

Wade failed the May 2007 Facility-wide initial panel test. Wade subsequently revealed to FFS that she had a prescription for Didrex, a weight loss drug that carries an adverse warning.

Based on this information, Wade was placed on the thirty-day leave of absence. Subsequent initial panel tests were "clean," and Wade was allowed to continue working at Dura. Wade was subsequently terminated in July 2008, for reasons unrelated to her May 2007 positive initial panel test.

Plaintiff Richard White has a back condition that he describes as a "deteriorating disk disorder." About ten years ago, White filed a workers' compensation claim related to his back injury. White's back impairment limits his ability to lift heavy objects, but, with the aid of medication, White was able to perform the essential functions of his job as a water tester. White never had any safety violations while on his prescribed medications when working at Dura.

White failed the May 2007 Facility-wide initial panel test. White subsequently revealed to FFS that he had a prescription for Lortab, Xanax, and Mezoprine Fortis, all of which contain adverse warnings. Based on this information, White was placed on the thirty-day leave of absence. White was re-tested during his leave of absence but again failed the initial panel test. He was then placed on a six-month layoff and ultimately terminated on December 19, 2007.

On May 9, 2008, the plaintiffs filed this action against Dura. After extensive discovery, both sides have filed motions for summary judgment, and Dura has also filed motions to dismiss the claims of Long and Birdyshaw on the grounds of judicial estoppel.

## ANALYSIS

The plaintiffs claim that the defendant, Dura, violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* and the Tennessee Disability Act, T.C.A.§ 8-50-103 *et seq.* The plaintiffs also claim that Dura committed breach of contract, committed the tort of public disclosure of private facts and tortiously placed them in a false light. The plaintiffs have

10

voluntarily dismissed, without prejudice, their age discrimination and Tennessee Human Rights Act claims. (Docket No. 57.) Both sides have moved for summary judgment, and the defendant has moved to dismiss the claims of plaintiffs Long and Birdyshaw on the grounds of judicial estoppel.[2]

## I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

_____

[2] In briefing the motions to dismiss, which the defendant originally brought under Federal Rule of Civil Procedure 12(c), the parties have submitted matters outside of the pleadings in support of their positions, and, therefore, the court will treat these motions as motions for summary judgment under Rule 56. *Bower v. Fed. Express Corp.*, 156 F. Supp. 2d 678, 684 (W.D. Tenn. 2001).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.      Judicial Estoppel Motions as to Long and Birdyshaw

Defendant Dura seeks a judgment in its favor on all claims brought by plaintiffs Long and Birdyshaw on the grounds of "judicial estoppel." Dura argues that, because these plaintiffs did not disclose their claims against Dura in conjunction with their respective Chapter 13 bankruptcy proceedings, the plaintiffs should be judicially estopped from asserting those claims here. (*See generally* Docket Nos. 34 and 48.)

Plaintiff Long filed for Chapter 13 bankruptcy protection on August 10, 2007, related to

12

his thirty-day leave of absence from Dura. (Docket No. 35 at 2.) The bankruptcy petition required Long to list "contingent and unliquidated claims of every nature." (Docket No. 34 Ex. 1 at 13.) Long stated that he had none. (*Id.*) Long filed his EEOC Charge (asserting discrimination by Dura) on November 7, 2007, and, along with his co-plaintiffs, filed this case on May 9, 2008. (Docket No. 35 at 2.) On February 8, 2008, the bankruptcy court approved Long's Chapter 13 Bankruptcy Plan, which provided Long some relief from his debts. (Docket No. 34 Ex. 2.) Until January 2009, Long apparently made no effort to update his bankruptcy petition to reflect his claims against Dura, and, in his affidavit in this case, Long claims that, until his January 2009 deposition, he had no idea that he was supposed to update his bankruptcy filings to reflect the Dura claims. (Docket No. 43 at 1-2.)

As the affidavits of Long and his counsel, Mr. Sharp, make clear, since Long's deposition in this case, Long and his current counsel have made substantial efforts to contact Long's bankruptcy attorney to correct the omission with the bankruptcy court. (Docket Nos. 43 and 44.) Long's bankruptcy attorney was apparently initially difficult to get ahold of, but, according to a letter filed with the court, as of March 19, 2009, Long's bankruptcy attorney, Robert Harlan, and Mr. Sharp were working together to prepare the necessary documents to ensure that the bankruptcy trustee was properly notified of the pending claims against Dura. (Docket No. 66 Ex. 1.)

Plaintiff Birdyshaw filed her Chapter 13 bankruptcy petition in May 2006, while still employed by Dura. (Docket No. 49 at 2.) Birdyshaw's Plan was confirmed on August 2, 2006. (Docket No. 52 Ex. A. at 3.) Birdyshaw filed her Charge of Discrimination with the EEOC on July 7, 2007, and, along with her co-plaintiffs, Birdyshaw filed this case against Dura on May 9,

13

2008. (Docket No. 49 at 2.) Like Long, Birdyshaw's bankruptcy petition required her to list "contingent and unliquidated claims of every nature," and Birdyshaw stated that she had none. (Docket No. 48 Ex. 1 at 8.) In October 2007, following her filing of the EEOC Charge and her termination (but before this case was filed), Birdyshaw filed a motion to modify her Plan, but her motion did not attempt to add any claims against Dura. (Docket No. 48 Ex. 3.) In her affidavit in this case, Birdyshaw states that she had no idea that she was supposed to amend her bankruptcy petition to reflect the claims against Dura. (Docket No. 53 at 1-2.) On March 26, 2008, Birdyshaw's bankruptcy petition was dismissed for noncompliance with the terms of the Plan, and, therefore, the "automatic stay" was lifted and Birdyshaw received no relief from her debts. (Docket No. 52 Ex. C.)

As noted above, Dura has moved to dismiss the claims of Long and Birdyshaw because they never amended their bankruptcy filings to reflect the claims against Dura, and, therefore, Dura argues, these plaintiffs are judicially estopped from asserting the claims against Dura here. The judicial estoppel doctrine "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation omitted). The Sixth Circuit has explained that judicial estoppel "preserve[s] the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002) (internal quotation omitted).

Although noting that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation or principle," the Supreme Court has identified the following considerations for determining whether to apply judicial

14

estoppel: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51 (internal quotations omitted). The Supreme Court warned, however, that these factors are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Id*. at 751.

In light of these considerations identified by the Supreme Court, the Sixth Circuit has held that "[t]he doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition." *Browning*, 283 F.3d at 775 (internal quotation omitted).

The Bankruptcy Code requires debtors to file, among other things, "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs." 11 U.S.C. § 521(1). This "duty of disclosure is a continuing one, and a debtor is required to disclose all potential causes of action" to the bankruptcy court. *Bohanan v. Bridgestone/Firestone North American Tire*, *LLC*, 2007 WL 1091209 at *3 (M.D. Tenn. April 10, 2007) (internal quotation omitted). The disclosure obligations "are at the very core of the bankruptcy process and meeting these obligations is part of the price debtors pay for receiving the bankruptcy discharge." *Id*.

15

The Sixth Circuit has found that judicial estoppel should be applied to bar causes of action that were not disclosed to the bankruptcy court. *See Lewis v. Weyerhaeuser Co.*, 141 Fed. Appx. 420, 425 (6th Cir. 2005) ("This court has previously found that pursuing a cause of action that was not disclosed as an asset in a previous bankruptcy filing creates an inconsistency sufficient to support judicial estoppel.") Indeed, where the plaintiff fails to mention a cause of action in his bankruptcy filing while simultaneously pursuing that cause of action in another court, the Sixth Circuit has found that the plaintiff adopted inconsistent positions and, by enforcing the plaintiff's Chapter 13 Plan under the assumption that no additional assets existed, the bankruptcy court adopts the plaintiff's original position for purposes of judicial estoppel. *See id.* ("Lewis's pursuit of her current discrimination action is without question 'contrary to' her sworn bankruptcy petition. ... it is also clear that in confirming Lewis's Chapter 13 plan, the bankruptcy court adopted Lewis's statement that she had no potential causes of action.")

However, the Sixth Circuit has held that, even where the above considerations would otherwise dictate that judicial estoppel should apply, its application is "inappropriate when [the] omissions are the result of mere mistakes or inadvertent conduct." *Eubanks v. CBSK Fin. Group*, 385 F.3d 894, 898 (6th Cir. 2004). Mistakes and inadvertence have been found where the debtor "lacks the knowledge of the *factual basis* of the undisclosed claim or where the debtor has no motive for concealment." *Id.* (emphasis added).

On the knowledge issue, while the plaintiffs, particularly Birdyshaw, may not have had knowledge of the factual basis of their claims at the time they filed for bankruptcy, they did have sufficient knowledge of those facts throughout much of the course of their bankruptcies, and the failure to update their asset schedules to include the claims against Dura supports Dura's claim

16

for the application of judicial estoppel.  *Bohanan*, 2007 WL 1091209 at *3.  The plaintiffs were

under a duty not only to disclose their assets at the time of their bankruptcy filings, but also to

update those disclosures during the pendency of their bankruptcies.  *See id.*  Accordingly, these

plaintiffs cannot avoid judicial estoppel on the basis of lack of knowledge.

On the motive issue, in most Chapter 13 cases, the debtor has a motive to conceal assets

because "[i]t is always in a Chapter 13 petitioner's interest to minimize income and assets."

*Lewis*, 141 Fed. Appx. at 426 (internal quotation omitted).  The rationale behind this rule is

simple.  The more assets that a Chapter 13 debtor discloses to the court, the greater the

percentage of his or her total debt will be included in the payment schedule.  Nevertheless, courts

have held that a motive to conceal does not exist in two situations:  (1) where the debtor has

made significant efforts to notify the trustee or other parties about the lawsuit, but, for some

valid reason, has not corrected his or her asset schedule, and (2) where the debtor is, for

whatever reason, paying 100 percent of his or her debt.  *See Eubanks*, 385 F.3d at 898-99;

*Browning*, 283 F.3d at 776 ("[The debtor] will thus receive no windfall as a result of its failure to

disclose its claims, because only [its] creditors will receive the distribution of any recovery.")

Here, both of these situations are applicable.

As to plaintiff Long, it is clear from Long's sworn affidavit that, until his January 2009

deposition, Long had no idea that he was supposed to correct his asset schedule.  (Docket No.

43.)  Further, as discussed above, Long, assisted by his current counsel, has taken significant

steps to correct the situation, and "the wheels" are apparently "in motion" so that the omission

will be corrected.  On these facts, it would be inappropriate to rule, as a matter of law, that Long

is estopped from asserting these claims here.

17

As to plaintiff Birdyshaw, her bankruptcy petition has been dismissed for noncompliance, and, therefore, the plaintiffs argue, she is receiving no relief from her creditors and she is still paying 100 percent of her debts. (Docket No. 52 at 7.) Specifically, the plaintiffs state, "because plaintiff Birdyshaw's Chapter 13 case was dismissed prior to filing this lawsuit, Plaintiff Birdyshaw will not receive any benefit from her inadvertent failure to amend her Chapter 13 petition. The dismissal requires her to pay all of her debts in full to her creditors." (*Id.*) The defendant fails to address this issue in its reply brief, and the plaintiffs' argument is well taken. Therefore, both motions, as to plaintiffs Long and Birdyshaw, will be denied. The court now turns to the merits of the cross motions for summary judgment.

## III.    Motions For Summary Judgment.

The parties have submitted cross motions for summary judgment on all of the plaintiffs' claims. The court will address each claim in turn.

### A.    Disability Act Claims

It is well-settled that, in order to be discriminated against on the basis of a disability under the Americans with Disabilities Act, the plaintiff must establish, as a primary matter, that he is disabled. *Penny v. United Parcel Serv.*, 128 F.3d 408, 414 (6th Cir. 1997). Under the ADA, an individual is disabled if he has "(1) a physical or mental impairment that substantially limits one or more major life activities; [or] (2) a record of such an impairment [or] (3) [been] regarded as having such an impairment." 42 U.S.C. § 12102(1).[3]

_____

[3] The court recognizes the "ADA Amendments Act of 2008," in which Congress, effective January 1, 2009, explicitly overruled major Supreme Court decisions construing the ADA and established that "the definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." P.L. 110-325 § 4(A). The ADA amendments do not influence the court's analysis

18

### 1.     "Substantially limits"

To qualify as disabled under this first, "substantial limits" prong, one must do more than allege a physical or mental impairment. *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. Appx. 488, 491-92 (6th Cir. 2008). Rather, to qualify as disabled, the physical or mental impairment must have a "substantially limit[ing]" effect on a major life activity. *Id.*

Here, the only potentially relevant "major life activity" raised by the plaintiffs is "working." When the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires, at a minimum, that the plaintiff allege that he or she is unable to work in a broad class of jobs, or a broad range of jobs in various classes. *Salim v. MGM Grand Detroit LLC*, 106 Fed. Appx. 454, 459 (6th Cir. 2004). The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. *Id.*

That said, it is undisputed that the plaintiffs were all able to perform their jobs at the time they were terminated, and, therefore, the plaintiffs were simply not substantially limited in the major life activity of working. For instance, as discussed above in the factual discussion, plaintiffs Bates, Birdyshaw, Long, Toungett, and White all allege that they suffer from physical or mental pain, but they fail to show that this pain, while potentially inconvenient or stressful on a day-to-day basis, significantly limited their abilities to perform the jobs from which they were terminated or, indeed, any of a broad class of jobs. The Sixth Circuit has repeatedly held that these types of general ailments (those that impose an uncomfortable, but not particularly

_____

because the court is to apply the ADA law that was in place at the time the conduct complained of occurred. *Verhoff*, 299 Fed. Appx. at 492.

restrictive, burden on the individual) do not render one disabled for purposes of this portion of the ADA. *See Huge v. GM*, 62 Fed. Appx. 77, 80 (6th Cir. 2003); *Agnew v. Heat Treating Servs. Of Am.*, 2005 WL 3440432, *5 (6th Cir. 2005); *Adams v. Potter*, 193 Fed. Appx. 440, 444 (6th Cir. 2006). As to plaintiff Wade, while she has alleged that she has diabetes, she has failed to present any evidence that her condition substantially limits any major life activity, including working, and simply having diabetes does not make one disabled for purposes of this provision. *Salim*, 106 Fed. Appx. at 459-60.

Finally, there was evidence presented that, due to her asthma, plaintiff Fisher was unable to perform the specific task of priming while employed by the defendant. (Docket No. 63 Ex. 1.at 15-18.) That said, Fisher admitted that she could perform virtually any other job at Dura besides priming jobs. (Docket No. 59 Ex. 4 at 71.) The inability to perform a single job for a single employer does not make one disabled. *Salim*, 106 Fed. Appx. at 459.

### 2. "Record of" disability

On the "record of disability" issue, the plaintiffs allege that they each have "a history of diagnosed medical impairments, ha[ve] suffered injuries on the job, or ha[ve] required leave under the Family Medical Leave Act that gave Dura notice that the plaintiff had a major impairment." (Docket No. 64 at 37.) Demonstrating that a plaintiff, over the entire course his employment, occasionally missed time or took leave or suffered assorted injuries on the job is simply insufficient to raise a fact issue as to whether the plaintiff had a record of a disability. *See Sebest v. Campbell City Sch. Dist Bd. of Education*, 94 Fed. Appx. 320, 326 (6th Cir. 2004) (finding that, to demonstrate that one is disabled because he has a "record of" disability, the plaintiff would have to present evidence "demonstrating that he had a record of an impairment

20

that substantially limits a major life activity.")  Indeed, to qualify as disabled under the "record of" disability prong, the plaintiff must show that he has a record or history of being classified as having a mental or physical impairment that substantially limits one or more major life activities. *EEOC v. DaimlerChrysler Corp.*, 111 Fed. Appx 394, 404 (6th Cir. 2004).

At most, with the exception of Fisher, the plaintiffs have put forth evidence that, for assorted reasons, they needed to miss time while at Dura to recover from isolated surgeries, accidents, and other unfortunate incidents, and that Dura may have been aware that these plaintiffs missed time for those events, because these plaintiffs filed for leave or otherwise notified Dura.  With the exception of Fisher, the plaintiffs have not presented evidence that they had a relevant record or history of a continuing, long-term impairment that substantially limited a major life activity.  Therefore, these plaintiffs are not disabled under this provision of the ADA either.  *Id.*

Plaintiff Fisher presents a different case, however.  Incorporating the elements of the traditional, well known *McDonnell Douglas* burden-shifting analysis, the *DaimlerChrysler* decision stands for the proposition that, if a plaintiff can raise a genuine issue of fact on the issues of (1) whether she had a "record of" disability and (2) whether she was terminated "because of" that record, summary judgment for the defendant on the plaintiff's ADA claim would be inappropriate.  111 Fed. Appx. at 404.  Fisher has raised a fact issue on both points.[4]

First, as discussed in the factual section, Dura's employment records reflect that plaintiff Fisher had shingles and was on medical leave from February 2007 to June 2007 that prevented

---

[4] Therefore, even if the other plaintiffs could establish that they had a "record of" disability, they would still fail to have a viable claim here, because there is no evidence that they were terminated because of that record.

her from working, imposing a substantial limitation on the major life activity of working.
(Docket No. 64 Ex. C. at 38-40, 57-60.)  Further, Dura's records reflect that Fisher was
terminated for not working enough hours in the prior year, a problem that was obviously related
to the time she missed due to shingles.  (*Id.* at 45.)  Indeed, these records, specifically Dura's
notes from the termination meeting, demonstrate that Dura understood that Fisher had to "back
out" from work in this February to June time period because of the shingles.  (*Id.*)  Dura argues
that Fisher was legitimately terminated, along with other employees, for lack of work, and it is
undisputed that Fisher was laid off in conjunction with other Dura employees at a time when
work was generally slow at the Facility.  (Docket No. 71 at 28.)  On this record, whether Fisher
was impermissibly terminated due to her "record of" disability or for legitimate reasons is a
question for the jury.

### 3.        "Regarded as" disabled

Finally, a plaintiff may only be considered "disabled" because he was "regarded as"
disabled by his employer if the plaintiff can show that the employer regarded the employee as
"significantly restricted in the ability to perform *either a class of jobs or a broad range of jobs* in
various classes as compared to the average person having comparable training, skills, and
abilities."  *Daugherty v. Sajar Plastics*, 544 F.3d 696, 704 (6th Cir. 2008) (emphasis added).
Here, the plaintiffs have failed to put forth evidence that Dura believed that the plaintiffs were
"significantly restricted" in their ability to perform "either a class of jobs or a broad range of jobs
in various classes."  Rather, the plaintiffs have put forth evidence that Dura regarded the
plaintiffs (and every employee at Dura) as a safety risk while on certain medications.  There is
simply no evidence that, in light of the standard laid out by the Sixth Circuit, Dura regarded the

22

plaintiffs as disabled, and, therefore, the plaintiffs' ADA claim fails on this ground as well.

### 4. Medical examinations or qualifying standards

In their Motion for Summary Judgment, the plaintiffs advance an alternative, and significantly more viable, theory of recovery under the ADA. In short, the plaintiffs contend that the initial panel test amounted to an impermissible "medical examination" under Section 12112(d)(4)(A) of the ADA. (Docket No. 64 at 26.) Under this provision of the ADA, "a covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). While it ultimately has little bearing on the viability of the plaintiffs' argument, it is important to clarify that this court has previously concluded that where, as here, medical screening of employees is company-wide, not prompted by the individual conduct of the plaintiff and results in the *per se* exclusion of individuals with certain medical conditions, the propriety of such testing is properly evaluated under Section 12112(b)(6) of the ADA, not Section 12112(d)(4)(A). *EEOC v. Murray*, 175 F. Supp. 2d 1053, 1062 (M.D. Tenn. 2001).[5]

---

[5] The defendant's argument that only disabled individuals may pursue claims under the ADA is without merit. (Docket No 68 at 4.) Numerous courts, including this one in the *Murray* case, which the defendant, bafflingly, repeatedly cites in support of this proposition, have concluded that a party need not be disabled to assert claims under provisions of the ADA that, like Sections 12112(b)(6) and 12112(d)(4)(A), protect all employees, not just disabled persons. *See Murray*, 175 F. Supp. 2d at 1062; *Wice v. GM*, 2008 WL 5235996, *2 (E.D. Mich. Dec. 15, 2008); *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 969 (8th Cir. 1999); *Jackson v. Lake County*, 2003 WL 22127743, *8 (N.D. Ill. Sept. 15, 2003); *Connolly v. First Personal Bank*, 2008 WL 4951221, *3 (N.D. Ill. Nov. 18, 2008). Certainly, as the defendant points out, certain courts have held that being disabled is a prerequisite to asserting any claims under the ADA. *See Armstrong v. Turner Industries*, 950 F. Supp. 162, 167-68 (M.D. La. 1996). The better reasoned

23

Indeed, Section 12112(b)(6) states that improper ADA disability discrimination includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

The defendant argues that its medical screening does not run afoul of Section 12112(b)(6) because it does not "screen out or tend to screen out" individuals with disabilities, as it screens individuals for drug use, both legal and illegal. (Docket No. 68 at 16.) This argument is unavailing. By screening out individuals who, by nature of their prescription drug use, have certain chemicals in their system that are designed to treat serious physical and mental problems, Dura's test clearly "tends to screen out" individuals with disabilities.

The defendant further argues that its medical screening is "job related and consistent with business necessity" because it was "created for safety reasons to decrease the number of workplace accidents at the" Facility. (Docket No. 59 at 31; Docket No. 68 at 17.) Specifically, Dura argues that, prior to its implementation of its drug-screening program, the Facility had "high levels of workplace accidents," including two incidents in early 2007 that Dura was able to directly link to workplace drug use. (Docket No. 68 at 17-18.) As the defendant repeatedly points out, plaintiff Toungett thought that, based on his observations of drug use at the Facility, broad drug testing at the Facility was a "good idea." (*Id*.) Therefore, Dura claims, it took the reasonable step of banning illegal drugs along with legal drugs "that carry a safety warning about

_____

position, however, is that the language of these provisions broadly protects all employees from intrusive and unfocused workplace medical testing. The soundness of this reasoning is reinforced by the policies expressed in the recent ADA amendments discussed earlier.

the operation of equipment while using the drug." (*Id.*)  Dura claims that this policy was "narrowly tailored" to achieve the goal of preventing workplace accidents, because it only banned legal drugs with an explicit safety warning.  (*Id.*)  Dura argues that it should be able to judge the risks at its plant and that it should not have to "wait for an accident to happen" before taking measures to protect employee safety, an approach that, Dura argues, would endanger its employees and put Dura at risk of significant liability.  (*Id.* at 19.)

While, in the name of "business necessity," Dura is undoubtedly permitted to conduct some medical evaluations of its employees, the ADA does substantially limit its discretion in this regard; that is, there must be some realistic connection between the medical screening and the work performed, such that the screening is "consistent with business necessity."  While there is relatively little case law strictly interpreting the term "business necessity," the *Wice v. GM*, 2008 WL 5235996 (E.D. Mich. Dec. 15, 2008) case provides some helpful, recent guidance.

At issue in *Wice* was GM's medical exam for its in-plant drivers.  *Id.* at *1.  As a condition of their in-plant driver's license, GM required these employees to take an extensive, periodic physical exam in order to ensure that they were still able to competently and safely operate mobile equipment within the plant.  *Id.*  For reasons that were not clear, the plaintiff, who was a long-time GM in-plant driver, refused to take the medical exam when it came time to renew his license.  *Id.*  GM provided the plaintiff the opportunity to have the physical exam conducted by the plaintiff's own doctor, but the plaintiff refused that option and, instead, presented a note from his doctor stating that the plaintiff's health was sufficiently good for the work he was performing.  *Id.*  GM refused to allow the plaintiff to work as a driver, and the plaintiff sued under the ADA, seeking his lost wages.  *Id.* at *2.

25

As here, the defendant argued that the plaintiff could not pursue a claim under Section

12112(b)(6) because the plaintiff was not disabled, and, as here, relying on well-settled

precedent, the court rejected that argument.  *Id.*  The court next turned to whether GM's medical

screening was "consistent with business necessity."  The *Wice* court endorsed the standard

adopted by the Second Circuit on this issue, which is:

> in proving business necessity, an employer must show more than that its inquiry is
> consistent with 'mere expediency.'  An employer cannot simply demonstrate that an
> inquiry is convenient or beneficial to its business.  Instead, the employer must first show
> that the asserted "business necessity" is vital to the business.  For example, business
> necessities may include ensuring that the workplace is safe and secure or cutting down on
> egregious absenteeism. The employer must also show that the examination or inquiry
> genuinely serves the asserted business necessity and that the request is no broader or
> more intrusive than necessary. The employer need not show that the examination or
> inquiry is the only way of achieving a business necessity, but the examination or inquiry
> must be a reasonably effective method of achieving the employer's goal  *Id.* at *3
> (quoting *Conroy v. New York State Dept. of Correctional Servs.*, 333 F.3d 88, 97-98 (2nd
> Cir. 2003).

Noting that "ensuring a safe workplace is a business necessity," the *Wice* court found

"that screening employees for medical conditions that may interfere with their ability to drive

mobile equipment safely is a 'reasonably effective method' of achieving GM's goal of a safe

workplace. Common sense suggests that GM should not have to wait for an accident to occur to

justify screening employees."  *Id.*   Key to the court's decision in favor of GM was the relative

flexibility of GM's program, as the court noted that "GM did not require Plaintiff to see the plant

nurse or doctor, but allowed him to provide a medical certification from his own doctor [and]

*[s]ignificantly, GM does not automatically exclude employees from driving who have certain*

*medical conditions, such as high blood pressure or diabetes*."  (*Id.*) (emphasis added).

Plainly, under this well-considered and soundly reasoned case law, Dura is not entitled to

summary judgment on this aspect of the plaintiffs' ADA claim.  While Dura's medical screening

program is based on the sound goal of "workplace safety," a reasonable juror could very well

find that the screening is "broader [and] more intrusive than necessary" because Dura

automatically excludes all employees who take certain medications from working in any

capacity at Dura, without any regard for individualized circumstances. Lindy Boots' deposition

testimony is particularly instructive on the inflexibility of the Dura policy. When asked whether

she would even *consider* letters from the employee's physician stating that the employee was

safe to perform his job while on a particular drug, Boots replied "No. Because that doctor

doesn't know what those essential functions and jobs are at every single aspect of our plant."

(Docket No. 63 Ex. 4 at 190-91.) Boots testified that only individuals who were physically at the

Facility could make the determination as to who could work there. (*Id.*) Further, Mark Jent

testified that he believed that, at the Facility, any employee on the production floor, performing

any job, who was taking any prohibited substance was a "direct threat to themselves or anyone

else out there." (Docket No. 72 Ex. 11 at 58.) In light of the sound case law discussed above,

the utter inflexibility of Dura's policy precludes summary judgment for Dura on this aspect of

the plaintiffs' ADA claim.[6]

      Perhaps the closer question is whether the plaintiffs are entitled to summary judgment on

this aspect of their ADA claim. However, as discussed in detail above, Dura has brought forth

evidence that the Facility is a somewhat dangerous place to work, had significant, drug-related

---

[6] This ruling does not, as Dura claims, put Dura in a "no win" situation, in which it is either sued under the ADA or sued for inevitable workplace accidents that could have been prevented by a stricter workplace drug policy. (Docket No. 68 at 19.) The court has no doubt that a policy that more reasonably balanced the health needs and individual circumstances of the employee with the legitimate needs of workplace safety would have been perfectly consistent with the dictates of the ADA and could have been easily developed and enforced.

safety issues and that Dura attempted to screen out only those drugs that, it believed, could cause impairment. In light of that evidence, the fact that "workplace safety" is a "business necessity," and the fact that businesses must retain ample discretion in how they structure on-site medical screenings in connection with "business necessities," the court cannot say, as a matter of law, that Dura's policy was not "consistent with business necessity." This is a question for the jury.[7]

### B. Other Claims

The remainder of the plaintiffs' claims are plainly without merit. First, there was no evidence presented that the plaintiffs, who were "at will" employees, had any contract with Dura, and, therefore, the plaintiffs' breach of contract claims fail as a matter of law. Similarly, the plaintiffs' false light and public disclosure claims are clearly time-barred. All these claims are based on oral statements allegedly made by Dura or its agent FFS at the time of the Facility-wide initial panel test in May 2007; specifically, the plaintiffs allege that Dura or FFS publicly and embarrassingly informed plaintiffs Birdyshaw, Wade, and Bates that they had failed the initial panel test. (Docket No. 64 at 44-49.) As these claims were not filed within six months of the time of the oral statements, the claims are clearly time-barred. *Cawood v. Booth*, 2008 WL

---

[7] Both parties also moved for summary judgment on the plaintiffs' Tennessee Disability Act claims. As a general matter, claims under the Tennessee Disability Act and the ADA are analyzed in the same manner. *See Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 (6th Cir. 2008). That said, the text of the Tennessee Disability Act does not appear to deal with "qualification standards" or medical screenings in the workplace and neither side has pointed the court to any case law in which the Tennessee Disability Act has been construed to apply to medical examinations in the workplace, nor has the court been able to locate any such law. Therefore, the court will dismiss the plaintiffs' Tennessee Disability Act claims (with the exception of Fisher's "record of disability claim") on the same ground that it will dismiss a substantial portion of the plaintiffs' ADA claims, that is, because the plaintiffs (with the exception of Fisher) have not sufficiently shown that they were disabled.

28

4998408, *4 (Tenn. Ct. App. Nov. 25, 2008); *West v. Media General Comergence Inc.*, 53 S.W. 3d 640, 648 (Tenn. 2001). Therefore, these claims will be dismissed as well.[8]

## CONCLUSION

For the reasons discussed herein, the defendant's motions to dismiss will be denied, the defendant's motion for summary judgment will be granted in part and denied in part, and the plaintiffs' motion for summary judgment will be denied. The plaintiffs may move forward with their claims under Section 12112(b)(6) of the ADA, and plaintiff Fisher may move forward with her disability discrimination claim under the ADA and Tennessee Disability Act based on the "record of" disability theory.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[8] The plaintiffs argue that the court should apply the principle of "equitable tolling" here and not enforce the statute of limitations. (Docket No. 72 at 46.) The Sixth Circuit has stated that, in assessing whether to apply the principle of equitable tolling, the court should consider "(1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice to the defendant; and 5) the plaintiff's reasonableness is remaining ignorant of the particular legal requirement." *Truitt v. County of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998). The plaintiffs suggest that they delayed filing their claims until after they exhausted their administrative remedies, and that it would not be fair to punish them for filing all of their claims together. (Docket No. 72 at 47.) This position is simply without merit. These plaintiffs would have known of their false light and public disclosure claims at the time of the Facility-wide test, and nothing prevented the plaintiffs from filing their false light and public disclosure of private facts claims within the time frame that is clearly established as a matter of Tennessee law.

29