# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# COLUMBIA DIVISION

| | |
|---|---|
| VELMA SUE BATES, CLAUDIA BIRDYSHAW, WILLARENE FISHER, MARK LONG, JON TOUNGETT, CAROLYN WADE, and RICHARD WHITE, )<br>)<br>)<br>)<br>)<br>)<br>) | |
|     **Plaintiffs,**   ) | Case No. 1:08-0029 |
| ) | Judge Trauger |
| v.   ) | |
| ) | |
| DURA AUTOMOTIVE SYSTEMS, INC.,   ) | |
| ) | |
|     **Defendant.**   ) | |

## MEMORANDUM

Pending before the court is the Plaintiffs' Motion to Reconsider the Issue of Improper Medical Inquiry (Docket No. 91), to which the defendant, Dura Automotive Systems, Inc. ("Dura"), has responded (Docket No. 95). For the reasons discussed herein, this motion will be granted.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On April 23, 2009, the court issued its ruling on the parties' cross-motions for summary judgment in this case in which the plaintiffs, among other things, asserted claims under the Americans with Disabilities Act (ADA). (Docket No. 77.) In summarizing the facts, the court stated as follows:

> The plaintiffs are former Dura employees who worked at Dura's Lawrenceburg, Tennessee manufacturing Facility, and who were all terminated by Dura. . . .
>
> In early 2007, managerial officers at the Facility became increasingly concerned that [legal and illegal] drug use at the Facility was leading to a significantly higher rate of workplace accidents than at comparable plants. . . . Therefore, in early 2007, Dura

1

contacted an independent, third-party drug testing organization known as Freedom From Self ("FFS"), which would assist Dura in implementing a new, comprehensive drug testing program. . . .

Dura decided that its new drug-testing program for the Facility would test for twelve substances, including those readily found [in] legal prescription drugs. . . .

In May 2007 . . . Facility-wide drug testing of the Facility's more than 450 employees [was conducted]. [E]ach employee . . . registered with an FFS representative [who] handed the employee a cup, and the employee went into a controlled environment . . . to urinate in the cup. After so doing, the employee would deliver the cup back to the FFS representative. (*Id.*) At this time, the FFS representative conducted an "initial panel test," which made a preliminary finding as to whether the urine contained any of the twelve substances. . . .

FFS sent each employee's [positive] urine sample to Quest Diagnostics, for confirmatory testing. Quest then sent the results of the confirmatory tests to Dr. Seth Portnoy, who . . . reviewed the confirmatory test results. If Dr. Portnoy saw that an employee tested positive for a substance found in legal prescription drugs, he would contact the employee to determine if there was a medical explanation for the positive result. If the employee provided a valid medical explanation . . . Dr. Portnoy changed the final, confirmed result of the drug test from "positive" to "negative." . . .

From Dura's perspective, however, all of this confirmatory testing was essentially irrelevant. If an employee failed the initial panel test, Dura ordered the employee to meet with FFS and present to FFS a list of all of the prescription medications that the employee was taking. After meeting with the employee, FFS sent Dura the employee's list of prescription medications and the warnings associated with them. [Dura representatives] then determined, for each employee, which of the medications listed had warnings about the operation of equipment or machinery or impaired mental alertness while using the medication ("adverse warnings"). Identifying these medications as prohibited, [Dura] then sent the employee a letter advising that Dura was placing the employee on a thirty-day leave of absence, to allow the employee an opportunity to transition to other drugs that Dura perceived as less risky or to stop using the drugs altogether.

This policy was utterly inflexible . . . several employees (plaintiffs in this case) obtained letters from their physicians stating that the employee's medications would not affect work performance and were necessary for the employee's health and functioning. These letters had no [e]ffect on Dura's treatment of the matter. . . . Dura's policy was "any employee, regardless of age or health status, taking drugs for any reason that carried warnings about the operation of equipment or machinery or impaired mental alertness were not allowed to work at Dura until he/she discontinued use of the prohibited drug". .

(Docket No. 77 at 1-5)(internal citation and quotation omitted)

An employee's compliance with prescription drug rules was confirmed by subsequent initial panel tests; an employee was usually terminated following a second, failed initial panel test. (*Id.* at 5.*)*

Each of the seven plaintiffs are former Dura employees who, at one time or another, failed an initial panel test because he or she was taking a legally prescribed prescription drug that contained one of the twelve banned substances. (*Id.*) Each of the plaintiffs' "positive" initial panel tests was later reversed by Dr. Portnoy to a "confirmed negative," due to the plaintiffs' documented medical need for the prescription drugs.[1] (*Id.*)

After an analysis of the facts and law, the court dismissed the vast majority of the plaintiffs' claims. The court found that, with the exception of plaintiff Fisher, the plaintiffs were not disabled as a matter of law and could not pursue ADA claims that required an initial showing of disability. (*Id.* at 18-22.) Plaintiff Fisher, however, had raised a fact issue as to whether she was terminated because she had a "record of" disability at Dura and, therefore, she could bring that claim (under the ADA and Tennessee Disability Act) to a jury. (*Id.* at 21.) The court also dismissed the plaintiffs' state law claims. (*Id.* at 28-29.)

---

[1] Specifically, plaintiff Bates was terminated following a failed "post layoff return to work" initial panel test in October 2007; (2) plaintiff Birdyshaw was fired for failing to submit a clean initial panel test; (3) plaintiff Fisher failed an initial panel test but, after stopping her use of the prohibited prescription drug, was laid off in conjunction with a larger layoff at the Facility; (4) plaintiff Long was fired after his third failed initial panel test; (5) plaintiff Toungett was fired shortly after a failed initial panel test and meeting with FFS that revealed the use of certain prescription drugs; (6) plaintiff Wade failed an initial panel test in 2007 but, after stopping her use of the prohibited prescription drug, was ultimately terminated in July 2008, for reasons unrelated to drug use; and (7) plaintiff White was fired following a second failed initial panel test. (*Id.* at 5-9.)

3

The remaining issue was whether the plaintiffs, despite not having a disability, could maintain a claim against Dura based upon the drug testing and evaluations that they were subjected to in the workplace. In summary judgment briefing, the plaintiffs argued that they could maintain such a claim under Section 12112(d)(4)(A) of the ADA. (Docket No. 64 at 26-27.) That provision states that "a covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

Dura argued that the plaintiffs were required to show disability to proceed with a claim under the ADA and, under the facts of this case, the appropriate provision of the ADA for analyzing the plaintiffs' claim was Section 12112(b)(6). (Docket No. 59 at 30-33.) This provision states that improper ADA disability discrimination includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). In response, the plaintiffs argued that, under either provision, Dura had run afoul of the ADA and the plaintiffs were entitled to proceed on their claims that Dura had imposed an illegal drug testing and evaluation regime. (Docket No. 72 at 36-40.)

In the April 23, 2009 Memorandum, the court recognized that it had "previously concluded that where, as here, medical screening of employees is company-wide, not prompted by the individual conduct of the plaintiff, and results in the *per se* exclusion of individuals with

certain medical conditions, the propriety of such testing is properly evaluated under Section 12112(b)(6) of the ADA, not Section 12112(d)(4)(A)." (Docket No. 77 at 23 citing *EEOC v. Murray*, 175 F. Supp. 2d 1053, 1062 (M.D. Tenn. 2001)). The court concluded that the plaintiffs did not have to be disabled to proceed with a claim under Section 12112(b)(6) and that there was a fact issue as to whether the qualification standard used was "job related and consistent with business necessity." (*Id.* at 24-28.)

On July 21, 2009, Dura moved to "clarify" (or reconsider) the court's opinion. (Docket No. 81.) Dura pointed out that, in *Murray*, this court indicated that an individual would need to be disabled to bring a claim under the ADA. (Docket No. 82 at 3-7.) In response, the plaintiffs again argued that disability should not be a prerequisite to challenge workplace drug testing under either Section 12112(b)(6) or Section 12112(d)(4)(A). (Docket No. 83 at 7.)

In a July 29, 2009 Memorandum, the court recognized the apparent inconsistency with *Murray* but stated that, in light of the distinctions between that case and this one and more recent case law and statutory developments, the plaintiffs should be allowed to proceed under Section 12112(b)(6), despite not all being disabled. (Docket No. 84 at 7.) Discussing the plaintiffs' continued Section 12112(d)(4)(A) arguments, the court reiterated that "this case is best evaluated using the rubric of Section 12112(b)(6). . . . Dura was not making inquiries beyond what drugs an employee was taking, and, therefore, the facts of this case do not fit well within the language of Section 12112(d)(4)(A)." (*Id.* at 6.)(internal citation and quotation omitted). At the defendant's request, the court certified, for interlocutory appeal, the question of whether "the plaintiffs must be disabled to pursue their claim under Section 12112(b)(6) of the ADA." (*Id.* at 10.)

On November 3, 2010, the Sixth Circuit issued its opinion on the defendant's interlocutory appeal. (Docket No. 90.) The court found that, "although non-disabled individuals may bring claims under some provisions of the [ADA], the plain text of subsection (b)(6) only covers individuals with disabilities." (*Id.* at 4.) The Sixth Circuit reiterated that the "primary purpose" of the ADA is to "prevent discrimination against disabled individuals," but "other sections of the Act apply to non-disabled individuals." (*Id.* at 5.)

While the Sixth Circuit did not explicitly state which provisions it was referring to, it did note that, because Section 12112(d)(4)(A) refers to testing of "employees" – not disabled individuals – "Congress intended subsection (b)(6) to be more limited than subsection (d)(4) and not broadly cover all employees." (*Id.* at 6.) The court also noted that "several courts have held that non-disabled individuals can pursue claims under Section 12112(d)(4)." (*Id.*) The Sixth Circuit did not, however, reach the question of whether subsection (d)(4)(A) allows non-disabled individuals to bring a claim or whether subsection (d)(4)(A) is the appropriate subsection under which the plaintiffs should proceed. (*Id.* at 7.)

In light of the Sixth Circuit's ruling, the plaintiffs filed the pending motion, asking the court to "reconsider the issue of whether the urine test for legal medications immediately followed by management's mandatory prescription disclosure is more properly analyzed under Section 12112(d)(4)(A) of the ADA than Section 12112(b)(6)." (Docket No. 92 at 1.)

## ANALYSIS

### I. Motion for Reconsideration Standard

The Court of Appeals for the Sixth Circuit has observed that the "Federal Rules of Civil Procedure do not explicitly address motions for reconsideration of interlocutory orders" but has

provided that "[d]istrict courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 Fed. Appx. 949, 959 (6th Cir. 2004) (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991)). While district courts have "significant discretion" in deciding motions for reconsideration, "[t]raditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez*, 89 Fed. Appx. at 959 (citing *Reich v. Hall Holding Co.*, 990 F. Supp. 955, 965 (N.D. Ohio 1998)). The Sixth Circuit's decision, which provides clarification on ADA law in the Sixth Circuit, provides sufficient ground for this Motion to Reconsider.

## II. The Parties' Arguments

The plaintiffs argue that Dura's drug testing program, even if it created a "qualification standard," also constituted a "medical examination/disability-related inquiry" and, therefore, the plaintiffs' claims are just as reasonably considered under Section 12112(d)(4)(A) as Section 12112(b)(6). (Docket No. 92 at 3.) That is, while the plaintiffs could not "qualify" to work at Dura while on certain prescription drugs, subjecting the plaintiffs to both an initial panel test and an individualized prescription drug investigation resulted in a medical examination and a "selective personal inquiry into medical conditions and prescription medications." (*Id.* at 2-4.)

The plaintiffs go on to cite a few cases that, they claim, support their position that their claims are reasonably advanced under Section 12112(d)(4):

> — *Connolly v. First Personal Bank*, 623 F. Supp.2d 928 (N.D. Ill 2008): The job applicant plaintiff had her offer of employment revoked after an employment

7

contingent drug test revealed the presence of a barbiturate. *Id.* at 929. While the plaintiff had a medical explanation, the defendant refused to reconsider the revocation. *Id.* The court denied the defendant's motion to dismiss the plaintiff's Section 12112(d) claim. *Id.* at 931-32.

— *Rowles v. Automated Productions Servs.*, 92 F. Supp.2d 424 (M.D. Pa. 2000): The plaintiff challenged the defendant's workplace policy that, facially, prohibited the use of any legally prescribed prescription drugs. *Id.* at 430. Citing Section 12112(d), the court concluded that "the policy violates the ADA to the extent that it prohibits the use of all legally prescribed controlled substances without a determination that such prohibition is job related and consistent with business necessity." *Id.* Issues of fact as to whether the policy had been enforced as to the plaintiff precluded summary judgment for the plaintiff. *Id.*

*See also Roe v. Cheyenne Mountain Conference Resort*, 124 F.3d 1221, 1229 (10th Cir. 1997)(corporate policy that required employees to report "all drugs" in their system, legal or illegal, implicated Section 12112(d)(4)). The plaintiffs also cite a series of Section 12112(b)(6) "qualification standard" cases to demonstrate that this section is employed where an individual has been denied employment based on some broad, threshold qualification. (*Id.* at 7-8 citing *e.g. Fuzy v. S&B Engineers & Constructors, Ltd.*, 332 F.3d 301, 302 (5th Cir. 2003)(plaintiff unable to meet job's 100-pound lifting requirement); *McKereghan v. City of Spokane*, 2007 WL 3406990, *4 (E.D. Wash. Nov. 13, 2007)(driver's license requirement is a "qualification standard"). Finally, the plaintiff cites a series of cases, largely discussed in earlier briefing, holding that a disability is not required to advance a claim under certain provisions of the ADA. (*Id.* at 9.)[2]

---

[2]*See e.g. Wice v. GM*, 2008 WL 5235996, *2 (E.D. Mich. Dec. 15, 2008)(relying on Section 12112(b)(6) and Section 12112(d)(4)); *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 969 (8th Cir. 1999)(Section 12112(d)(4)); *Conroy v. NY State Dept. of Corrections*, 333 F.3d 88, 94-95 (2nd Cir. 2003)(same); *see also* (Docket No. 77 at 23).

In response, Dura argues that the court correctly applied Section 12112(b)(6) because Dura employed a facility-wide qualifying standard that did not make inquiries beyond what drugs an employee was taking, and, therefore, "the facts of this case do not fit well within the language of Section 12112(d)(4)(A)." (Docket No. 95 at 4.) Dura employed a narrowly-focused policy that looked to weed out prescription drug use amongst all of its employees; there was no individualized inquiry into whether an employee had a disability and no traditional "medical examination." (*Id.* at 4-5.) Rather, Dura only wanted to know what drugs its employees were taking – not about the underlying condition. (*Id.*) Moreover, Dura argues, the court has already ruled on this issue twice, and, in the face of "no new facts" or argument, there is no basis for the court to reverse course now. (*Id.*)

### III. Resolution

As discussed below, the court concludes that (1) the court's previous holding that the plaintiffs' claims challenging the drug testing protocol were properly asserted under Section 12112(b)(6) should not bar the plaintiffs from asserting claims under Section 12112(d)(4)(A); (2) the plaintiffs' claims "fit" within the scope of Section 12112(d)(4)(A); and (3) the plaintiffs' lack of disability does not bar their claims here. In light of all of this, the plaintiffs are entitled to bring their Section 12112(d)(4)(A) claims to trial.

#### A. Section 12112(b)(6) versus Section 12112(d)(4)(A)

It is important to recall that the court initially concluded that Section 12112(b)(6) provided a better guide than Section 12112(d)(4)(A) because that was the conclusion reached in *Murray*. There, the court stated that, because health and drug screening was "not prompted by individual conduct, it does not seem to come within the scope of medical examinations and

9

inquiries covered by Section 12112(d)(4)(A). Instead [the defendant's] requirement that all forklift operators must submit to periodic medical screening and its *per se* exclusion of individuals with certain medical conditions from operating forklifts appears to be the type of generally applicable qualification standard discussed in Section 12112(b)(6)." 175 F. Supp.2d at 1062. The court's initial decision on this issue here was informed almost entirely by its own precedent.

Also, at the time of the initial ruling in this case, the distinction between whether this was a Section 12112(b)(6) case or a Section 12112(d)(4)(A) case did not seem of great import. Indeed, in the April 23, 2009 Memorandum, the court stated that, while it was "important" to "clarify" that Section 12112(b)(6) provided the proper evaluative rubric, the choice between 12112(b)(6) and 12112(d)(4)(A) "ultimately has little bearing on the viability of the plaintiffs' argument" because, implicitly, the court believed that the plaintiffs could proceed under Section 12112(b)(6) or 12112(d)(4)(A) without a showing of disability. (Docket No. 77 at 23.) Now, however, the Sixth Circuit's opinion has framed the issue in somewhat starker relief, because it held that the plaintiffs had to show disability to proceed under Section 12112(b)(6) and strongly suggested, without deciding, that non-disabled plaintiffs could proceed under Section 12112(d)(4)(A) if they otherwise qualified.

On further reflection, the court finds that there is no reason that Section 12112(b)(6) and 12112(d)(4)(A) must be mutually exclusive and, therefore, no legitimate reason that the plaintiffs should not be allowed to proceed under the statute that they originally invoked, Section 12112(d)(4)(A), simply because their claim arguably better fits within the scope of Section 12112(b)(6). That is, an employer could have medical "qualification standards" that

10

also resulted in a "medical examination." For instance, if an employer concluded that no employee could have blood pressure exceeding 200/120, that rule would implicate both a qualification standard and a medical examination. Therefore, on further reflection, the court recognizes that this case need not be either a Section 12112(b)(6) case or a Section 12112(d)(4)(A) case.

B.     **Sufficiency of Section 12112(d)(4)(A) Claim**

The next issue is whether the plaintiffs have sufficiently alleged a Section 12112(d)(4)(A) claim. Again, this provision states:

> a covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

This provision implicates two types of employer conduct: (1) medical examinations and (2) disability inquiries – both of which must be justified by business need.[3] While, as indicated in the July 29, 2009 Memorandum that ruled on the Motion to Clarify, the "inquiries" prong does not appear to neatly "fit" with the unique facts of this case, a reasonable jury could find that Dura subjected the plaintiffs to a "medical examination."[4] While the medical "exams" at issue – the initial panel test and the follow-up review of prescriptions – were not directed at

---

[3] The court already concluded that the issue of whether Dura's drug testing protocol was sufficiently justified by business need is one for the jury. (Docket No. 77 at 25.).

[4] The plaintiffs point to the "EEOC Enforcement Guide," which states that a "disability-related inquiry" may include inquiries about prescription drug use. (Docket No. 92 at 5.) Again, because Dura's general focus was on the feared consequences that the drugs would have on its employees – not on the underlying malady – the inquiries prong does not appear to be a good "fit" for the facts of this case.

11

analyzing the effects of any medical condition, significant authority indicates that the initial panel test and follow-up interview could be viewed as a "medical examination" under the ADA.

Most notably, the ADA states that "a test to determine the *illegal* use of drugs shall not be considered a medical examination." 42 U.S.C. § 12114(d)(emphasis added). This provision can certainly be reasonably read to suggest that urinalysis and similar testing – outside of testing for illegal drugs – constitutes a medical examination under the ADA. Also, as discussed above, the plaintiffs have brought forth non-controlling authority (essentially unchallenged by the defendant) suggesting that testing for legal drugs constitutes a medical examination. *See Connolly*, 623 F. Supp.2d at 929; *see also cf. Meyer v. Qualex*, 388 F. Supp.2d 630, 637 (E.D.N.C. 2005)(finding drug test was not a "medical examination" because the evidence showed that the test was for illegal drugs). The court, therefore, concludes that Section 12112(d)(4)(A) is an appropriate vehicle to challenge the drug testing protocol used in this case.

C.      **Requirement of Disability**

As noted above and in the April 23, 2009 Memorandum, numerous courts have determined that a plaintiff need not be disabled to challenge an employer's conduct under Section 12112(d). (*See* Docket No. 77 at 23-24, collecting cases). Also as indicated above, the Sixth Circuit's opinion in this case strongly suggested that Section 12112(d) does allow non-disabled individuals to challenge their employers' drug testing protocols. Therefore, recognizing that there is not uniformity of opinion on this issue, the court concludes that, if the Sixth Circuit had reached this issue, it would have concluded that the plaintiffs need not be disabled to assert Section 12112(d)(4)(A) claims.

**CONCLUSION**

The plaintiffs' Section 12112(d)(4)(A) claims may proceed to trial, along with plaintiff Fisher's disability discrimination claims. As directed by the Sixth Circuit, the claims of the non-disabled plaintiffs under Section 12112(b)(6) will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge