**] IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| VELMA SUE BATES, CLAUDIA | ) | |
| BIRDYSHAW, WILLARENE FISHER, | ) | |
| MARK LONG, JON TOUNGETT, | ) | |
| CAROLYN WADE, and RICHARD WHITE | ) | |
| | ) | |
|     Plaintiffs, | ) | **Case No.: 1:08-cv-00029** |
| | ) | **Judge Trauger** |
| vs. | ) | **JURY DEMAND** |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, INC., | ) | |
| | ) | |
|     Defendant. | ) | |

---

## PLAINTIFFS' RESPONSE TO DURA'S
## SECOND MOTION FOR SUMMARY JUDGMENT

---

COME NOW, Plaintiffs, by and through their counsel, and submit the following response to Defendant Dura Automotive Systems, Inc.'s Motion for Summary Judgment.

### PROCEDURAL BACKGROUND

On November 5, 2010, Plaintiffs filed a Motion to Reconsider a prior ruling requesting that the court adopt a medical inquiry analysis under 42 U.S.C. §12112 (d)(4)(A). The motion was granted and this matter set for trial on July 12, 2011. (Doc. Nos. 97, 100). On February 14, 2010 Defendant Dura Automotive Systems, Inc. filed a Motion for Summary Judgment on the issue that its medical inquiry was not the proximate cause of the damages suffered by the Plaintiffs, including their requests for punitive damages, compensatory damages in the form of back pay, and injunctive relief. (Doc. No. 103) This memorandum of law is in response to the Defendant's Motion for Summary Judgment.

## STATEMENT OF FACTS

At the end of 2006, Vice President of Human Relations, Teresa Skotak announced the Drug Free Workplace Program in a conference call originated from her office in Rochester Hills, Michigan. (Boots Dep., p. 18)  Ms. Skotak did not supervise local implementation of the plan. (Id.; Jent Dep., p. 34)  In the spring of 2007, without any written agreement between the parties, Dura Automotive Systems hired Freedom From Self to administer the Drug Free Workplace Program. (Boots Dep., p. 25;  Jent Dep., p. 33)  Ms. Boots' had no training in Tennessee's Drug Free Workplace Act. (Boots Dep., p. 9)  Mr. Jent, who has a degree in environmental biology, had no training in substance abuse policies and the Tennessee Drug Free Workplace Act. (Jent Dep., p. 8-9) Mr. Jent and Ms. Boots hired Lisa Peden of Freedom From Self to administer the new substance abuse policy. (Boots Dep., p.26-28)  Ms. Boots advised Lisa Peden that she wanted to test for the broadest range of drugs possible, and approved the list of medications targeted by the screen. (Peden Dep., p. 172; Boots Dep., p. 36)  Lisa Peden has no medical training.  (Peden Dep., p. 204, 205; Boots Dep., p. 27)  Ms. Peden and her employees are approved by the testing laboratory, Quest Diagnostics, to collect urine and mail it to the lab in Atlanta. (Peden Dep.,p. 25, 26, 28, 30, 31) Quest Diagnostics choose Dr. Seth Portnoy to serve as the medical review officer. (Id., p. 93).  Lisa Peden testified that no decision could be made from the preliminary result of the instant panel screen because the final test results came from the medical review officer. (Id., p. 95)  Freedom from Self used the wrong forms and, therefore, the substances for which they actually tested were not the substances disclosed to the employees. (Id., p. 118, 119, 139, 140)  Equally troubling is Ms. Boots' testimony that she had no knowledge as to whether the new drug policy was posted for employees to read. (Boots Dep., p. 41, 45)

Dr. Portnoy is licensed as a medical review officer. (Portnoy Dep., p. 3, 4, 5) He was the only medical expert involved in the process adopted by Dura Automotive Systems. Dr. Portnoy testified he had no discussion with Freedom From Self, yet Lisa Peden testified that she called the medical review officer to discuss warnings on prescription medication labels. (Peden Dep., p. 75; Portnoy Dep., p. 12, 21, 23) Dr. Portnoy interviewed each of the Plaintiffs and confirmed their results as "negative" for purposes of the substance test conducted by Dura Automotive Systems. (Portnoy Dep., p. 19-49) Equally important, even Dr. Portnoy has no method to determine the quantity or frequency of medications taken by the Plaintiffs. (Portnoy Dep., p. 49, 51) Dura Automotive Systems clearly ignored the efforts of Dr. Portnoy, and targeted the Plaintiffs for removal from the workforce. Dura's conduct suggests the importance of punitive damages to prevent this type of conduct in the future. Even those Plaintiffs that retested "negative" because they valued their jobs more than there personal health suffered a thirty day unpaid leave. Since causation for damages and the requirement for standing to prove a prima facie case requires a showing of an adverse employment action, the specific facts of each individual Plaintiff require a brief summary.

a.    **Richard White**

Richard White was forty-five (45) years old, and worked for Dura Automotive for 23 years. (White Dep., p. 29, 34) Mr. White is on several medications for back pain prescribed under the supervision of his doctor. (Id., p. 17, 24) He takes medication for insomnia and anxiety prescribed under the supervision of his doctor. (Id., p. 13, 16) Mr. White received good performance evaluations and never had any safety violations while on his prescribed medication while working for Dura Automotive. (Doc. 28, p. 18)

On May 7, 2007, Mr. White arrived at work and was required to submit to a substance test. (White Dep., p. 53)  Mr. White tested positive. (Id., p 57)

The confirmation test performed by Quest Diagnostics was negative. (Doc. 64-7, Appx. G-3) Because the confirmation test was negative, Dr. Portnoy was not required to contact Mr. White. (Portnoy Dep., p. 40-41)  Dr. Portnoy certified the result as negative and sent the results to Freedom from Self. (Id., p. 40-41; Doc. 64-7, Appx. G-4)

Thereafter, Mr. White went to Freedom from Self where he was required to disclose all medications he was taking. (Peden Dep., p. 188) A list of Mr. White's medications which had warning labels was sent to Mark Jent and Lindy Boots. (White Dep., p. 65-66; Doc. 64-7, Appx. G-6)  Among the list of medications sent to Mark Jent and Lindy Boots, was Soma, a sleep aid Mr. White was taking. (Doc. 64-7, Appx. G-6)  However, according to Lisa Peden, Soma was not one of the substances that would have shown up on the instant panel substance test.  (Peden Dep.131-132) Ms. Boots used that information to prepare a letter to Mr. White. (Boots Dep., p. 110; Doc. 64-7, Appx. G-5)  The letter placed Mr. White on a thirty (30) day unpaid leave of absence. (Doc. 64-7, Appx. G-5)  Ms. Boots specifically listed Soma, a substance which was not on the list of drugs tested for, as one of the drugs which Mr. White was required to stop taking in order to keep his job. (Id.)

Mr. White was retested on May 17, 2007 at the Freedom from Self clinic. (Doc. 64-7, Appx. G-7)  The second drug test was positive. (White Dep., p. 64)  Dr. Portnoy contacted Mr. White on May 22, 2007 and determined that he had a valid prescription for the substances detected.  (Portnoy Dep., p. 42)  Dr. Portnoy reversed the result from a positive to a certified negative.  (Doc. 64-67, Appx. G-10)

On June 18, 2007, Mr. White's personal physician, Dr. Robert Cochran, sent a letter to Dura Automotive stating that White needed to stay on his prescribed medications and that the medications would not interfere with White's ability to perform his job functions. (Jent Dep., p. 31) After six months of unpaid leave, on December 19, 2007, Mr. White was terminated from his position at Dura Automotive. (Doc. 64,7, Appx. G-12) Mr. White did not work after May 7, 2007. Impermissible discrimination based on a medical inquiry was the proximate cause of his injuries.

**b.    Caroline Wade**

Caroline Wade was a forty-six (46) year old female who worked at Dura Automotive Systems for 11 years. Ms. Wade is on medication to control her diabetes, including weight loss medication, prescribed under the supervision of her doctor. (Wade Dep., p. 19, 21, 26) Ms. Wade never had any safety violations while on her prescribed medications. (Doc. 28, p. 16)

On May 10, 2007, Ms. Wade arrived at work and was required to submit to an instant panel substance screen. (Wade Dep., p. 26) Ms. Wade tested positive and was not allowed to return to work. (Id., P. 86-87) This unpaid leave is compensable damages in this case.

Dr. Portnoy contacted Ms. Wade on May 16, 2007 and determined that Ms. Wade had a valid prescription. (Portnoy Dep., p. 37) Dr. Portnoy reversed the result from a positive to a certified negative. (Id.; Doc. 64-6, Appx. F-4)

Thereafter, Ms. Wade was required to disclose all medications. A list of Ms. Wade's medications was sent to Mark Jent and Lindy Boots. (Peden Dep., p. 188) Ms. Boots sent a letter placing Ms. Wade on a thirty (30) day unpaid leave of absence. (Doc. 64-6, Appx. F-5; Id.) Ms. Wade was required to take a follow-up drug test. (Id.) If Ms. Wade continued to take her medications and tested positive in the follow-up drug test, she would be terminated. (Id.)

Ms. Wade consulted with her physician who advised her to continue taking her prescription medications. Ms. Wade's physician provided a letter stating the medications she takes do not interfere with her work and do not place any of her co-workers in jeopardy. (Wade Dep., p. 94)

Ms. Wade was on unpaid leave from May 10, 2007 to June 19, 2007. This unpaid leave is part of Ms. Wade's damages caused by the improper medical inquiry. Against her physician's advice Ms. Wade stopped taking her medications, and on June 19, 2007, tested negative on the follow-up drug test. (Wade Dep., p. 99; Doc. 64-6, Appx. F-7) The confirmation test by Quest Diagnostic was also negative. (Portnoy Dep., p. 38; Doc. 64-6, Appx. F-9) Because the confirmation test was negative, Dr. Portnoy was not required to contact Ms. Wade . (Portnoy Dep., p. 38) Dr. Portnoy certified the result as negative. (Id., p. 38 Doc. 64-6, Appx. F-10)

Ms. Wade was tested again on October 1, 2007 and April 22, 2008. (Portnoy Dep., p. 38-39) All subsequent instant panel tests and confirmation tests were negative. (Id.; Doc. 64-6, Appxs. F-13,F-16)

With no medical training, Human Resources Manager Lindy Boots told Carolyn Wade to stop taking Didrex for her diabetes. (Wade Dep., p. 28) Ms. Wade's personal physician wrote a letter stating the Didrex would not cause any side effects and came with no warning label, and Ms. Boots did not care. (Id., p. 29, 37, 95; Coll. Ex. F[1], p. 1-2) Stopping the medications needed is an injury that is connected to this improper medical inquiry. A reasonable juror can also find that discrimination was a factor in Mrs. Wade's termination were approximately 10 workers below Ms. Wade in seniority were moved from Class I employees to Class II employees without ever leaving

---

[1] Collective Exhibits A through G were produced by Dura Automotive Systems pursuant to the Plaintiffs' Second Request for Production of Documents.

the Class I equipment, and Ms. Wade was laid off under the pretext of lack of production in Class II when she was working on Class I equipment. (Doc. 73, Aff. C. Wade, ¶¶ 1-3) Not recalled to work, she has since been terminated. (Wade Dep., p. 96, 100)

**c.     Mark Long**

Mark Long was thirty-five (35) years old, and worked in the assembly process at Dura Automotive. (Long Dep., p. 39, 42) Mr. Long is on several medications for back pain prescribed under the supervision of his doctor. (Id., p. 42-43, 48)  Mr. Long has received good performance evaluations and has never had any safety violations while on his prescribed medication for back pain. (Doc. 28, p. 12)

On May 10, 2007, Mr. Long arrived at work and was required to participate in the plant-wide drug screen.  (Long Dep., p. 74)  Mr. Long was informed that he tested positive. (Id., p. 74-75; Doc. 64-4, Appx. D-1)  Dura Automotive placed Mr. Long on an unpaid leave. This unpaid leave is part of Mr. Long's damages in this case that are directly connected to the improper medical inquiry.

Mr. Long was required to disclose all medications.  (Doc. 64-4, Appx. D-4)  A list of Mr. Long's medications was sent to Mark Jent and Lindy Boots. (Peden Dep., p. 188)  Ms. Boots used that information to prepare a letter to Mr. Long. (Doc. 64-4 Appx. D-3)  The letter placed Mr. Long on a thirty (30) day unpaid leave of absence based on the results of the instant panel test. (Id.)  Mr. Long was required to take a follow-up substance test. (Id.)  If Mr. Long continued to take his medications and again tested positive in the follow-up substance test, he would be terminated. (Id.) Dr. Portnoy certified the result as negative. (Doc. 64-4, Appx. D-2)

However, Mr. Long's supervisor asked him to continue working in spite of his positive drug test. (Long Dep., p. 69)  Mr. Long continued to work for approximately two months until a specific

batch of products was completed. (Id.)  Immediately thereafter, Mr. Long was laid off.  According to Lindy Boots, it was an oversight that Mr. Long was allowed to continue to work after testing positive on the plant-wide drug screening (Boots Dep., p. 154)

Mr. Long was eventually recalled to work.  On July 19, 2007, Mr. Long submitted to a second drug test as a result of his return to work. (Long Dep., 79-80)  Mr. Long was informed that he tested positive. (Long Dep., p. 74-75; Doc. 64-4,  Appx. D-5)  Dura Automotive again placed Mr. Long on a thirty (30) day unpaid leave.  (Long Dep., p. 82)

Dr. Portnoy contacted Mr. Long on July 23, 2007 and determined that he had a valid prescription for the substances detected in his test results. (Portnoy Dep., p. 32)  Dr. Portnoy reversed the result from a positive to a certified negative.  (Id.; Doc. 64-4, Doc. 64-4, Appx. D-8)

Ms. Boots sent a second letter to Mr. Long. (Long Dep., p. 89-90; Doc. 64-4, Appx. D-9)  The letter informed Mr. Long that he was being placed on another thirty (30) day unpaid leave of absence based on the results of the instant panel test. (Doc. 64-4, Appx. D-9)  Mr. Long was told that he was required to take a follow-up drug test. (Doc. 64-4, Appx. D-9)  If Mr. Long continued to take his medications and again tested positive in the follow-up drug test, he would be terminated. (Doc. 64-4, Appx. D-9)  On August 16, 2007, Mr. Long submitted to the follow-up test and tested positive. (Long Dep., p. 104)

Dr. Portnoy contacted Mr. Long on August 20, 2007 and determined that he had a valid prescription for the substances detected in his test results. (Portnoy Dep., p. 33)   Dr. Portnoy reversed the result from a positive to a certified negative.  (Id; Doc. 64-4, Appx. D-13)

On August 27, 2007, Dura Automotive laid-off Mr. Long with no projected recall date. (Doc. 64-4, Appx. D-14)  Mr. Long was terminated on February 18, 2008. (Doc. 64-4, Appx. D-15)  The

improper medical inquiry into Mr. Long's prescription medications was the motivating factor in his termination, and a reasonable juror can find the cause of his termination.

**d.    Claudia Birdyshaw**

Claudia Birdyshaw was a forty-two (42) years old female employed with Dura Automotive in the assembly of glass systems for 22 years. (Birdyshaw Dep., p. 5, 25-26) Ms. Birdyshaw is on several medications for back pain under the supervision of her doctor. (Id., p. 37-41, 43-44)  Ms. Birdyshaw received good performance evaluations and never had any safety violations while on her prescribed medication for back pain while working for Dura Automotive. (Doc. 28, p. 6)

On May 10, 2007, Ms. Birdyshaw arrived at work and was required to submit to a substance test. Ms. Birdyshaw tested positive on the instant panel screen. (Birdyshaw Dep., p. 67)  Ms. Birdyshaw was placed on an unpaid leave of absence. (Id., p. 68)  The confirmation test conducted by Quest Diagnostics was negative. (Id.)  Because the confirmation test was negative, Dr. Portnoy was not required to contact Ms. Birdyshaw. (Portnoy Dep., p. 24)  Dr. Portnoy certified the result as negative. (Id)

The nurse for Dura Automotive (presumably Lisa Peden) met with Ms. Birdyshaw and advised Ms. Birdyshaw that she was addicted to those prescription drugs and the nurse for Dura Automotive instructed Ms. Birdyshaw to stop taking those medications. (Birdyshaw Dep., p. 67, 77, 85)  A list of Ms. Birdyshaw's medications was sent to Mark Jent and Lindy Boots. (Peden Dep., p. 188)

Ms. Boots sent a letter placing Ms. Birdyshaw on a thirty (30) day unpaid leave of absence. (Doc. 64-2, Appx. B-5)  On or about June 13, 2007, Ms. Birdyshaw consulted with her physician who advised her to continue taking her prescription medications. (Birdyshaw Dep., p. 68, 81)  On

June 19, 2007, Ms. Birdyshaw submitted to the follow-up drug test. (Id., p. 100) Ms. Birdyshaw again tested positive. (Id., p. 71)

However, Quest Diagnostics was unable to perform confirmation testing because of a problem with the urine specimen sent to Quest. (Portnoy Dep., p. 24-25; Doc. 64-2, Appx. B-9) Dr. Portnoy contacted Ms. Birdyshaw on June 22, 2007 and determined that Ms. Birdyshaw had not intentionally contaminated her urine specimen. (Portnoy Dep., p. 25) As a result, Ms. Birdyshaw was required to re-take the follow-up drug test on June 25, 2007. (Doc. 64-2, Appx. B-11) In this test, Ms. Birdyshaw tested positive. (Doc. 64-2, Appx. B-12) Because of the positive result, Dr. Portnoy contacted Ms. Birdyshaw on June 27, 2007 and determined that she had a valid prescription for oxycodone. (Portnoy Dep., p. 28-29) Dr. Portnoy reversed the result from a positive to a certified negative. (Id., p. 29; Doc. 64-2, Appx. B-13)

Prior to Dr. Portnoy completing his work, on June 26, 2007, Dura Automotive wrote a letter informing Ms. Birdyshaw that she was laid off because she tested positive in the follow-up test. (Doc. 64-2, Appx. B-14) Ms. Birdyshaw was terminated on December 19, 2007. (Doc. 64-2, Appx. B-15) The facts clearly demonstrate Dura Automotive Systems' total disregard for Dr. Portnoy, and form a strong basis for a reasonable juror awarding punitive damages.

e.      **Sue Bates**

Sue Bates was a fifty-eight (58) years old female and a faithful employee with Dura Automotive for many years. (Bates Dep., p. 43) Ms. Bates is on several medications for her medical conditions all of which were prescribed under the supervision of her doctor. (Id., p. 6, 9, 12, 14-15, 17, 54) Ms. Bates never incurred any safety violations while on her prescribed medications. (Doc. 28, p. 4) On May 7, 2007, Ms. Bates participated in the plant-wide substance test. (Bates Dep., p.

48) The instant panel test results show that Ms. Bates tested positive. (Id., p. 58) After receiving the letter placing her on unpaid leave, on June 18, 2007, Ms. Bates took a follow-up test which was negative. (Id., p. 65-66) This instant panel test was negative. (Doc. 64-2, Appxs. A-7, A-8) The unpaid leave forms part of Ms. Bates damages in this case.

Dura Automotive Systems' policy included return to duty testing. On October 1, 2007, Ms. Bates was subjected to a substance test after returning from a voluntary leave. (Bates Dep., p. 69) Ms. Bates tested positive. (Doc. 64-1, Appx. A-9) Dr. Portnoy contacted Ms. Bates on October 4, 2007. (Portnoy Dep., p. 23) Dr. Portnoy determined that Ms. Bates had a valid prescription and reversed the positive result and certified it as negative. (Id.) Dr. Portnoy's results were sent to Freedom from Self. (Id., p. 23-24) On October 10, 2007, Dura Automotive ignored the negative confirmation test result from Dr. Portnoy and terminated Sue Bates. (Boots Dep., p. 10, 119) The improper medical inquiry was the cause of Ms. Bates suffering termination.

**f.    Jon Toungett**

Jon Toungett is also a return to work case. Jon Toungett was forty-nine (49) years old. (Toungett Dep., p. 30) Mr. Toungett is on medications for back pain and anxiety prescribed under the supervision of his doctor. (Id., p. 7, 48) Mr. Toungett received good performance evaluations. He had one safety violation in 18 years of service. (Doc. 28,p. 14)

On May 10, 2007, Mr. Toungett arrived at work and was required to submit to a substance test. (Toungett Dep., p. 37-38) He tested negative. On August 20, 2007, Mr. Toungett required a trip to the emergency room in Nashville, Tennessee due to severe back pain. (Id., p. 42) On August 23, 2007, he was required to submit to an instant panel screen. (Id., p. 42) He tested positive. (Id.; Doc. 64-5, Appx. E-5) Dr. Portnoy contacted Mr. Toungett on August 29, 2007 and determined that he

had a valid prescription for the substances detected. (Portnoy Dep., p. 35-36) Dr. Portnoy reversed the result from a positive to a certified negative. (Id.; Doc. 64-5, Appx. E-8) On August 30, 2007, Mr. Toungett was terminated from his position at Dura Automotive. (Toungett Dep., p. 43) Though he was not required to release his prescriptions, several days prior to the test he left work with severe back pain to go to the emergency room. Three days later he was subject to the instant panel screen. Seven days later he was terminated. The cause of his termination was the improper instant panel screen in light of Dr. Portnoy's confirmed negative result. A reasonable juror can award punitive and compensatory damges.

g.      **Willarene Fisher**

Willarene Fisher is also a return to work case. Willarene Fisher was a sixty (60) year old female and employed in the assembly of glass systems for 17 years. (Fisher Dep., p. 15, 42) Ms. Fisher is on several medications for the pain associated with shingles under the supervision of her doctor. (Id., p. 26-27) Ms. Fisher is also on prescription medications for high blood pressure, and breathing problems associated with asthma. (Id., p. 68-69) Ms. Fisher has never had any safety violations while on her prescribed medications. (Doc. 28, p. 8)

After an extended leave of absence from Dura Automotive because of shingles, Ms. Fisher returned on work on or about June 1, 2007. (Fisher Dep., p. 28) At the time she returned to work, Ms. Fisher was required to participate in a substance test. (Id., p 23) She tested positive. (Id., p. 25) Dura Automotive placed Ms. Fisher on unpaid leave for thirty (30) days. (Id., p. 24) Dr. Portnoy contacted Ms. Fisher on June 14, 2007 and determined that she had a valid prescription. (Portnoy Dep., p. 30) Dr. Portnoy reversed the result from positive to certified negative. (Id., p. 30; Doc. 64-3, Appx. C-4) Shortly thereafter, Ms. Fisher received a letter from Dura Automotive telling her to

Case 1:08-cv-00029   Document 111   Filed 03/14/11   Page 12 of 29 PageID #: 3159

report to work in 30 days for a second substance test. (Fisher Dep., p. 24; Doc. 64-3, Appx. C-5) The letter also requested Mrs. Fisher to discontinue the use of her medications. (Doc. 64-3, Appx. C-5) Against the advice of her physician, Ms. Fisher discontinued use of the medications. (Fisher Dep., p. 25) This extended unpaid leave is part of Ms. Fisher's damages.

On July 14, 2007, Ms. Fisher participated in the follow-up drug test. The instant panel test was negative for all substances tested. (Fisher Dep., p. 25; Doc. 64-3, Appx. C-8) Because the confirmation test was negative, Dr. Portnoy was not required to contact Ms. Fisher. (Portnoy Dep., p. 31) Dr. Portnoy certified the result as negative. (Id.; Doc. 64-3, Appx. C-11)

Upon returning to work, Ms. Fisher was placed at one of the positions in the windows division. (Fisher Dep., p. 28) Ms. Fisher's work was cut back to four days a week and eventually was cut back to three days a week because Dura Automotive alleged that there was insufficient work for her in that area. (Id., p. 29) Ms. Fisher was then assigned to a work station where her job duties included applying primer to windows. (Id.) Because of her asthma, Ms. Fisher suffered breathing difficulties. (Id., p. 34) Dura Automotive was informed of these breathing difficulties. (Id., p. 15, 18) Ms. Fisher's physician advised her to take off from work for three weeks in order to recover from the exposure to the primer fumes. (Id., p. 16) On September 4, 2007, Ms. Fisher returned to work. Because there was allegedly no other available work, Dura Automotive assigned Ms. Fisher to continue applying primer. (Id., p. 17) On September 5, 2007, after one day of working with the fumes, Ms. Fisher was experiencing breathing difficulties. (Id., p. 18) She called in sick. (Id.) On September 6, 2007, Ms. Fisher returned to work and was summoned to the Human Resources Department where she was informed that due to only working 270 hours for the year, she was terminated. (Id., p. 52-54) However, Dura Automotive does not have a policy stating that an

employee must work a certain number of hours. (Boots Dep., p. 145)  Rather, according to Lindy

Boots, Ms. Fisher was terminated because Dura Automotive could not accommodate her disability.

(Id., p. 91, 144)  A reasonable juror can find that the disclosure of prescription medications was a

factor in Ms. Fisher's termination, and that the failure to work 270 days was pretext for terminating

an employee using prescription medications.

## STATEMENT OF LAW

Title VII allows a person "aggrieved by the alleged unlawful employment practice" to bring

a private cause of action. 42 U.S.C. 2000e-5(f)  The ADA shares the same remedies as Title VII. (42

U.S.C.§2000e-4 to 2000e-6, §2000e-8, §2000e-9)  Title VII recognizes as an unlawful employment

practice discrimination "which was a motivating factor" leading to an adverse employment action.

(42 U.S.C. §2000e-2(m) Specifically, if an employee provides evidence that the employer "relied

upon a statutorily protected characteristic as a factor in taking an employment action adverse to the

plaintiff," then the employee has successfully established a case of discrimination under the ADA.

Minna v. City of Chillicothe, 2000 WL 191828, *9 (6th Cir. 2000)(Doc. 59-3).  However, damages

are limited where the defendant "would have taken the same action in the absence of the

impermissible motivating factor..." to declaratory and injunctive relief, costs, and attorney's fees.

§2000e-5(g)(2)(B)(I).  On the other hand, punitive and compensatory damages are recoverable if the

prohibited employment practice was the cause of the adverse employment action. Buchanan v. City

of San Antonio, 85 F. 3d 196, 200 (5th Cir. 1996); Pedigo v. P.A.M Transport, Inc. 60 F.3d

1300,1301-03 (8th Cir. 1995)

An employee need not be disabled to challenge an improper medical exam.  Wice v. General

Motors Corp.,2008 U.S. Dist. LEXIS 106727 (E.D. Mich., 2008) (GM requires medical exam for

Case 1:08-cv-00029   Document 111   Filed 03/14/11   Page 14 of 29 PageID #: 3161

"inplant" drivers license). A medical exam cannot relate to a business goal if it automatically excludes employees. (Id., p. *5)  Moreover, when individuals are excluded because their mere presence is a direct threat to others and not related to job performance or skill, and no other qualification standard eliminates that person, the absence of a job related issue suggests they are in a protected classification of employees. Jana Morton v. United Parcel Service, 272 F.3d 1249 (9th Cir. 2001) (hearing impaired employee could not pass DOT certification as a pre-condition to being a delivery truck driver)  Congress intended to permit employer insistence upon across-the-board qualification standards only if those standards provide an accurate measure of an applicant's actual ability to perform the job. (Id., p.1263)

 The Sixth Circuit held in Ross v. Campbell Soup Co.,237 F.3d 701, 709 (6th Cir.2001):

> [T]he drafters of the ADA and its subsequent interpretive regulations clearly intended that plaintiffs who are mistakenly regarded as being unable to work have a cause of action under the statute....In cases such as this one, where there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, combined with evidence that the employer concocted a pre-textual justification for that firing, the need for more extensive factual inquiry into whether the employer engaged in unlawful discrimination is especially acute.

 In Roe v. Cheyenne Mountain Conf. Resort, Inc., 124 F.3d 1221,(10th Cir. 1997) ( employer drug testing required employees to report prescription medications), noted that the legislative purpose of the ADA was to end the effects of medical inquiries and examinations because individuals with diseases such as cancer "may object merely to being identified, independent of the consequences." An adverse employment decision on the basis that the employee (or job applicant) responded to impermissible questions is an injury in fact allowing an employee to seek damages and injunctive relief to remedy his or her injury. (Id.) also see Griffin v.Steeltek, Inc. 160 F.3d 591, 596

Case 1:08-cv-00029   Document 111    Filed 03/14/11   Page 15 of 29 PageID #: 3162

(10th Cir. 1998) (job applicant asked impermissible questions was not hired which is an injury in fact).

**Legal Argument**

I.    **A reasonable juror can conclude that a motivating factor in the termination of the Plaintiffs was that the Plaintiffs were part of a group of employees who used prescription medications under the care of their personal physicians which were identified by Dura Automotive Systems through an improper medical inquiry in violation of 42 U.S.C. §12112 (d)(4)(A).**

If an employee provides evidence that the employer "relied upon a statutorily protected characteristic as a factor in taking an employment action adverse to the plaintiff," then the employee has successfully established a case of discrimination under the ADA. Minnix v. City of Chillicothe, 2000 WL 191828, *9 (6th Cir. 2000) (Doc. 59-3) 42 U.S.C.§12112 (d)(4) prohibits employers from requiring current employees to undergo medical examinations absent a showing of job relatedness and business necessity. Dura Automotive Systems removed persons from the workforce who used certain legal prescription medications under the care of a physician. Dura Automotive Systems acted behind a mask of safety when, in reality, the Plaintiffs exhibited no evidence of symptoms from side affects and, more importantly, no evidence of risk in performing any specific job function, operating any specific machinery, or being stationed at any specific work station where there is a known risk of harm to others. The group of employees who use prescription medications under the care of their personal physicians were given no opportunity to present medical evidence showing they are fit for their specific position. In those cases where letters from treating physicians were provided, they were ignored. The facts in this case provide numerous instances of discrimination against the Plaintiffs, individually, and as a class of individuals who received legal prescription medications under the care of their physician in violation of 42 U.S.C. §12112 (d)(4)(A). The Plaintiffs find

themselves unemployed. A reasonable juror can conclude that the Plaintiffs were discriminated against because they were singled out by management's medical inquiry, which was a motivating factor in their termination, and respectfully request a finding of damages.

The ADA (through reference to Title VII) recognizes as an unlawful employment practice discrimination "which was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C.§2000e-4 to 2000e-6, §2000e-8, §2000e-9, and §2000e-2(m). A reasonable juror can find that the employment practices of Dura Automotive Systems in removing from the workforce persons who used legal prescription medications under the care of a physician, like the Plaintiffs, was the motivating factor behind the unlawful employment practice.

The Defendant cites the case of <u>Albemarle Paper Company v. Halifax Local No. 425,</u> 422 U.S. 405, 95 S. Ct. 2362 (1975). In this case a class of black employees brought an action for an injunction to challenge certain validation tests conducted by Albemarle Paper Company. Five years later the complaint was amended to request money damages in addition to injunctive relief. The Supreme Court held that in light of the statute designed to eradicate racial discrimination that back pay was available to support the Congressional policy behind the statute prohibiting discrimination. (<u>Id</u>., p. 415, 416) The court reasoned that, if limited to injunctive relief, the employer has no incentive to comply with the law. (<u>Id</u>., p. 417) Therefore, *proof of discrimination is presumptive proof that back pay is owed to the employee.* (<u>Id</u>., p. 421) (emphasis added)

In this case, Dura Automotive Systems engaged in a mandatory disclosure of medical prescriptions and conditions following an instant panel substance test. Similar to the validation test in <u>Albemarle Paper,</u> a reasonable juror can find that the Plaintiffs were discriminated against as a

group protected under the ADA, and therefore, have presumptive proof that back pay is owed as one available measure of damages.

Even though not immediately terminated, with no medical training, Human Resources Manager Lindy Boots told Carolyn Wade to stop taking Didrex for her diabetes. (Wade Dep., p. 28) Ms. Wade's personal physician wrote a letter stating the Didrex would not cause any side effects and came with no warning label, and Ms. Boots did not care. (Id., p. 29, 37, 95; Coll. Ex. F[2], p. 1-2). Simply stopping Ms. Wade's needed medication is a compensable injury in fact.

When questioned with a hypothetical regarding an employee who receives a local anesthetic by the dentist, Ms. Boots testified that such an employee will be terminated if he fails to disclose his dentist visit. (Boots Dep., p. 53) Plaintiff Jon Toungett was subject to this exact discriminatory treatment. Mr. Toungett asked and received permission to take a Monday off to get medical attention for his back pain. (Toungett Dep., p. 41-42) Mr. Toungett returned to work the next day and was forced to take a substance test. (Id.) The results were positive, and Mr. Toungett was terminated 10 days later without receiving an opportunity to take a retest or being given an opportunity to switch to a different medication. (Id.) A reasonable juror can find punitive damages under these facts.

Mark Long was similar to Jon Toungett because both were subject to instant panel screen and terminated from their employment. Mark Long and Jon Toungett were administered the instant panel screen in the plant wide substance screening. Mark Long's instant panel was positive. (Long Dep., p. 74, 75) Even though Mr. Long was positive, he was called back after two weeks to work

_____

[2] Collective Exhibits A through G were produced by Dura Automotive Systems pursuant to the Plaintiff's Second Request for Production of Documents.

on the production line as a mold operator because there was no one else available to operate the mold. (Id., p.79)  The other Plaintiffs were not allowed to return to work.  On July 19, 2007, after the production work was finished, Mr. Long was again administered the instant panel screen. (Long Dep., p. 79, 80)  Mr. Long tested positive and was given thirty (30) days to retest, and in August tested positive for his same medications. (Id., p. 82, 88)  After Mr. Long's third test in August he received a letter placing him on indefinite leave with no projected recall date. (Doc. 64-4, Appx. D-14; Long Dep., p. 90)  Mr. Long and Mr. Toungett were both subject to substance screens, but treated very differently.  Mr. Toungett was terminated 10 days after the instant panel screen on August 30, 2007 and given no opportunity to go off his medicines. (Long Dep., Id., p. 41-44)  Mr. Long was given an opportunity to retest, Mr. Toungett was not.  Mr. Long was laid off with no projected recall date, Mr. Toungett was terminated.  These two men in similar circumstances were treated very differently. Both were terminated, and a reasonable juror can find the cause of the termination was based on the use of legal prescription medications under the care of a physician.

Ms. Bates was terminated on October 10, 2007, six days after Dr. Seth Portnoy issued a confirmed negative drug test result. (Portnoy Dep., p. 23-24)  Ms. Bates testified that Shannon Littrill, an HR employee; told her she was terminated for failing to disclose two of her prescription medications. (Bates Dep., p. 76, 77, 78)  There is no evidence that other employees of Dura Automotive Systems were terminated for failure to disclose all medicines.  Ms. Boots stated that normal employee discipline includes a verbal warning, written warning, 30-day suspension, and termination. (Boots Dep., p. 60)  Bates was not given any warnings prior to her termination.

**II.     A reasonable juror can conclude that the cause in fact of the adverse employment actions was an improper medical inquiry in violation of 42 U.S.C. § 12112(d)(4)(A) entitling the Plaintiffs to recover compensatory and punitive damages.**

The Plaintiffs were required to disclose their prescriptions either directly to Safety Director Mark Jent or to Freedom From Self. (Wade Dep., p. 28-29, 37; Long Dep., p. 88; Toungett Dep., p. 67-68; Bates Dep., p. 76; White Dep.,p. 65; Fisher Dep., p. 25; Birdyshaw Dep., p. 73-74) If they disclosed their use of prescription medications, they were terminated. (Boots Dep., p. 61) If they did not disclose their use of prescription medications, they were violating the direct orders of Dura Automotive Systems and would face disciplinary action. (Peden Dep., p. 102-103) In fact, Sue Bates testified that she was terminated for failing to disclose all of her prescription medications. (Bates Dep., p. 78)

It is undisputed that each of the Plaintiffs was laid-off (except Mr. Toungett) and ultimately terminated by Dura Automotive Systems. On October 1, 2007, Ms. Bates was required to take a drug test at Dura Automotive Systems. (Bates Dep., p. 69) Although the instant panel test was positive, the medical review officer certified Ms. Bates confirmation test as negative because Ms. Bates had a valid prescription. (Portnoy Dep., p. 23) Dura Automotive terminated Sue Bates on October 10, 2007 and did not give her an opportunity to discontinue taking her medications or seek out alternative medicines. (Boots Dep., p. 10, 119)

On June 19, 2007, Ms. Birdyshaw was required to submit to the follow-up drug test. (Birdyshaw Dep., p. 100) Because of a positive result on the unconfirmed instant panel test, Claudia Birdyshaw was laid-off on June 26, 2007 before Dr. Portnoy conducted his review of the test results. (Doc. 64-2, Appx. B-14) Ms. Birdyshaw was terminated on December 19, 2007. (Doc. 64-2, Appx. B-15)

After discussing all her medications, including medications for asthma, Ms. Fisher was assigned to a work spray painting primer on windows. (Fisher Dep., p. 29) Because of her asthma,

Ms. Fisher suffered breathing difficulties. (Id., p. 34) On September 4, 2007, Ms. Fisher returned to work. Because there was allegedly no other available work, Ms. Fisher was assigned to continue spray painting primer. (Id., p. 17) On September 5, 2007, after one day of working with the fumes, Ms. Fisher was experiencing breathing difficulties. (Id., p. 18) She called in sick. (Id.) On September 6, 2007, Ms. Fisher returned to work. Ms. Fisher was summoned to the Human Resources Department where she was informed that due to only working 270 hours for the year, she was terminated. (Id., p. 52-54) However, Dura Automotive does not have a policy stating that an employee must work a certain number of hours. (Boots Dep., p. 145) After she disclosed medication for asthma, Ms. Fisher was terminated when assigned to spray paint primer.

On August 16, 2007, Mr. Long submitted to the follow-up test. (Long Dep., p. 104; Doc. 64-4, Appx. D-10) Mr. Long tested positive. (Doc. 64-4, Appx. D-12) Dr. Portnoy contacted Mr. Long on August 20, 2007 and determined that he had a valid prescription for the substances detected, and reversed the result to a certified negative. (Portnoy Dep., p. 33; Doc. 64-4, Appx. D-13) On August 27, 2007, Dura Automotive laid-off Mr. Long with no projected recall date. Doc. 64-4, (Doc. 64-4, Appx. D-14) Mr. Long was terminated on February 18, 2008. (Doc. 64-4, Appx. D-15)

On August 20, 2007, Mr. Toungett required a trip to the emergency room in Nashville, Tennessee due to severe back pain he was experienced. (Toungett Dep., p. 42) On August 23, 2007,was required to submit to a substance test. (Id.) Dr. Portnoy contacted Mr. Toungett on August 29, 2007 and determined that he had a valid prescription for the substances detected, and reversed the result to a certified negative. (Portnoy Dep., p. 35-36; Doc. 64-5, Appx. E-8) Nonetheless, on August 30, 2007, Mr. Toungett was terminated from his position at Dura Automotive. (Toungett Dep., p. 43)

Ms. Wade joined this law suit while still employed by Dura Automotive Systems. Approximately 10 workers below Ms. Wade in seniority were moved from Class I employees to Class II employees. These 10 never left the Class I equipment. Ms. Wade was laid off under the pretext of lack of production with her being the lowest in seniority. (Doc. 73, Aff. C. Wade, ¶¶ 1-3) She is no longer subject to recall and is unable to return to service at Dura since she has been off work over six months. (Wade Dep., p. 96) A reasonable juror can find the shift of employees pretext for eliminating Ms. Wade from the workforce following the disclosure of medications.

Mr. White was directed by Dura Automotive to submit to a second drug test on May 17, 2007. (Doc. 64-7, Appx. G-7) The second drug test was positive. (White Dep., p. 64; Doc. 64-7, Appx. G-7) Dr. Portnoy contacted Mr. White on May 22, 2007 and determined that he had a valid prescription for the substances detected . (Portnoy Dep., p. 42) Dr. Portnoy reversed the result from a positive to a certified negative. (Id.; Doc. 64-7, Appx. G-10) Dura Automotive ignored a letter from Mr. White's physician when it made the decision to termination Mr. White. (Boots Dep., p. 100) Nonetheless, on December 19, 2007, Mr. White was terminated from his position at Dura Automotive. (Doc. 64-7, Appx. G-12)

In its effort to disallow compensatory and punitive damages, defendant Dura Automotive Systems cites the case of Buchanan v. City of San Antonio, 85 F. 3d 196 (5th Cir. 1996). In this case patrolman Buchanan injured his back in a chase while working for the county. After a full recovery, he put in a job application with the City of San Antonio. His application was rejected. Patrolman Buchanan filed suit under the ADA alleging that he was subjected to a medical exam prior to a conditional offer of employment, and his medical information was not kept in a separate confidential file. As a job applicant he could not recover back pay. However, the district court granted a directed

verdict on the ADA claims and submitted a jury instruction asking the jury if Patrolman Buchanan sustained damages, and if so, to determine the damages for "future pecuniary losses, emotional pain and suffering, inconvenience, and mental anguish." The jury returned an award of $300,000.00 in compensatory damages. (Id., p. 198) The Fifth Circuit recognized that Patrolman Buchanan was entitled to recover compensatory damages where the prohibited employment practice was the cause of the job applicant's rejection. (Id., p. 200). The Fifth Circuit reversed on other grounds ruling that the directed verdict was not proper given testimony that Patrolman Buchanan did not wait one year following a previous job application.

In fact, in response to the positive drug tests, many of the Plaintiffs, contacted their personal physicians to ask whether or not their use of medications posed a safety threat. These physician letters state that medications do not place any co-workers in danger. (Coll. Ex. Doc. 64-1 - 64-7)

Causation is directly related to the manner in which the Drug Free Workplace Program was implemented.

Dura Automotive Systems was on notice that the medications were used to accommodate the medical conditions of the Plaintiffs, yet made no further inquiry into the nature or extent of these conditions. (Boots Dep., p. 179)

If this type of discrimination is taken to its logical conclusion, employers will be allowed to require the employee to disclose all the trappings of his or her medical history. Failing to find discrimination in this practice is to invite employers to test for sleep apnea, migraine headaches, diabetes, depression, or simply for tooth aches, and ultimately test for possible genetic disorders or even coordination so long as every person employed is tested equally without any reference to job performance.

In contrast, Dura Automotive Systems stated belief the Plaintiffs were unable to perform any job at the plant based upon unfounded fears. Dura Automotive Systems did not conduct an individual examination of the Plaintiffs to determine if each Plaintiff posed a threat to plant safety based upon the dosage of medications, interaction of medications, and the specific job description for each Plaintiff. Mark Jent states in his Declaration that "[u]nder the drug testing policy, **any employee, regardless of age or health status...were not allowed to work at Dura** until he/she discontinued use of the prohibited drug." (Doc. 62, ¶ 10) He admits that Dura Automotive Systems did not care whether an employee actually experienced any side effects associated with the employee's medications. He also admits that a person taking the medications were prohibited from working at any position at Dura, even if the position posed no safety threat to others.

A reasonable juror can find causation between the disclosure of medication and conditions and termination, allowing for compensation and punitive damages.

**III.    The Plaintiffs have established standing to sue for jurisdictional purposes because persons testing negative on the instant panel substance screen were treated differently from persons with confirmed negative results who were required to disclose medications.**

The Plaintiffs' may establish their prima facie case of discrimination under the ADA and establish standing by showing that "a similarly situated person outside of the protected class received comparatively favorable treatment." Jakimczuk v. DaimlerChrysler Corp., 2006 WL 1624549, *2 (N.D.Ohio,2006)

> As the Sixth Circuit has frequently phrased the requirements of a prima facie claim of disparate treatment using such a "comparable non-protected person was treated better" element as one of the requisites, the plaintiff must produce evidence which at a minimum establishes (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees.

<u>Mitchell v. Toledo Hosp.</u>,964 F.2d 577, 582 -583 (C.A.6 (Ohio),1992) (Citing <u>Davis v. Monsanto</u>

<u>Chemical Co.</u>, 858 F.2d 345 (6th Cir.1988), <u>Long v. Ford Motor Co.</u>,496 F.2d 500 (6th Cir.1974)).

      In her Declaration, Ms. Boots stated that employees who tested positive during the plant-wide instant panel test were laid-off and eventually terminated if they refused to stop taking their medications. (Doc. 61)  It did not matter to Dura Automotive Systems if the employee had a valid prescription.  (Doc. 61)[3]   In contrast, employees who did tested negative during the plant-wide instant panel test returned to work.  Dura Automotive Systems treated the Plaintiffs differently from other employees based solely on the Plaintiffs use of certain medications.   The difference in treatment of the Plaintiffs is the basis for standing.

      In <u>EEOC v. Murray, Inc.</u>, 175 F. Supp.2d 1053 (M.D. Tenn. 2001) employee, Raymond Waits, was an insulin-dependent diabetic who worked at the Murray plant for over 20 years. (175 F. Supp.2d at 1055)  In 1996, Murray implemented new policies which prohibited an employee who had insulin dependent diabetes from operating a forklift. (<u>Id</u>.)  During his medical examine, Mr. Waits revealed his diabetes. (<u>Id</u>., p. 1056)  He was immediately removed from his position as a forklift operator and eventually terminated.(<u>Id</u>.)   "Murray did not require any further medical examinations or inquiries to determine the effect of Waits' diabetes on his ability to operate the forklift safely." (<u>Id</u>.)

      This Court concluded that Murray's testing violated the ADA because it failed to distinguish between individuals with diabetes who could safely perform the job and those who posed a threat to others.

---

   [3]  Ms. Boots claims even if the employee had a prescription, they were still in violation of the company policy. (Doc. 61) However, on May 15, 2007, Ms. Boots sent a memo to corporate human resource officers stating that only employees who did not have a valid prescription would be terminated. (Doc. 64-8, Appx. H-1)

> Where, as in this case, the defendant screens for specific medical conditions rather than actual physical or mental abilities, it [must establish] that all individuals with the specified conditions necessarily will have the accompanying physical or mental limitations that prevent them from being able to perform the essential functions of the position.

(Id., p. 1065-66)

Dura Automotive Systems accepted as true the myth that employees taking certain medications are dangerous and acted on this myth without conducting an actual investigation into whether the Plaintiffs were able to perform their jobs.

Dura Automotive Systems confuses standing to bring a cause of action under F.R.C.P. 8 with causation for the damages. Defendants rely on David v. Passman, 442 U.S. 228, 234, 245(1979), a case in which Congressman Otto Passman from Louisiana terminated deputy administrative assistant, Shirley Davis, on the basis of her gender. Ms. Davis plead that Congressman Passman violated the Fifth Amendment of the Constitution and that she was entitled to damages in the form of back pay. (Id., p. 231) The Fifth Circuit held that there was no private cause of action under the Fifth Amendment because Congress failed to create a damages remedy. (Id., p. 232) The Supreme Court reversed finding a private cause of action in which damages in the form of back pay is appropriate and ordinary for an invasion of personal liberty interests. (Id., p. 234, 245) In order to have standing, the Plaintiff must provide a short statement of the grounds for jurisdiction, entitlement to relief, and a demand for relief or different types of relief. F.R.C.P. 8 Like Shirley Davis who was found to have standing under the Fifth Amendment, the Plaintiffs rely on a statutorily protected characteristic as a factor in taking an employment action adverse to them under 42 U.S.C. §12112 (d)(4)(A). The Plaintiffs request relief in the from of declaratory and injunctive relief, costs, and attorney's fees, and punitive and compensatory damages which flow from the prohibited employment

practice, an improper medical exam. This court can find jurisdiction under F.R.C.P. 8 because the Plaintiffs have stated a claim under 42 U.S.C. §12112 (d)(4)(A).

## CONCLUSION

Dura Automotive Systems identified persons with substances in their blood and required those persons to provide information about their prescription medications and conditions to management. In spite of letters from their physicians, no observed symptoms from possible side effects, no risk analysis of their specific tasks, and near perfect safety records, management presented no path to the Plaintiffs to return to their positions. Those employees like Ms. Fisher and Ms. Wade who did stop their medications were later targeted and terminated. Mr. Long's instant panel screen was positive for medications, yet his supervisor continued to work Mr. Long.

Dr. Portnoy is licensed as a medical doctor and a certified medical review officer. He reviewed the lab test results - results which Dura Automotive Systems never saw - and concluded in his written report that the Plaintiffs on whom he received results were confirmed negative. Dura Automotive allowed those employees who were negative on the instant panel screen to return to work, and those employees who were certified negative by the medical review officer were removed from the work force.

The Plaintiffs have established all factors to satisfy the prima facie case of discrimination. Dura Automotive Systems self serving conclusions that the plant has more incidents when compared to other plants is not supported by the direct testimony of its managers. Specifically, Ms. Boots and Mr. Jent indicate no actual incidents in the plant over the past twelve months were causally connected to prescription medications.

Persons like the Plaintiffs on medications were not allowed to present medical evidence that they can perform their job functions, diminishing Dura Automotive Systems' safety argument to a simple pretext for removing long term, hard working, conscientious workers from the work force. There is no evidence in the record of an individual medical examination to establish excessive use, abuse of medications, observed side effects, or to document any inability to perform their essential job functions because of their medications.

A reasonable juror can conclude that an improper medical inquiry was a factor in the involuntary unpaid leaves of absence and termination of the Plaintiffs and others known to use prescription medication under the care of a physician. A reasonable juror can find that Dura Automotive Systems simply stereotype persons on legal prescription medications as bad persons and separated them from employment, establishing causation that support compensable and punitive damages.

The Plaintiffs respectfully request that this court deny the motion for summary judgment submitted by Dura Automotive Systems.


Respectfully submitted,

/s/ John A. Beam, III
John A. Beam, III, BPRN 11796
Kristin Fecteau, BPRN 19772
*Equitus Law Alliance, PLLC* 709 Taylor Street
P.O. Box 280240
Nashville, Tennessee 37228

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the Plaintiff's Response to Second Morion for Partial Summary Judgment with the Clerk of this Court using the CM/ECF system which will automatically send email notification of such filing to the following parties who are CM/ECF participants:

| | | |
|---|---|---|
| Robert E. Boston | Gary W. Klotz | Ben Boston |
| Michael J. Rusie | Craig M. Stanley | Boston, Holt, Sockwell & |
| Andrew S. Naylor | 150 West Jefferson, | Durham, PLLC |
| Paula D. Walker | Suite 150 | 235 Waterloo Street |
| Waller Lansden Dortch & | Detroit, Michigan 48226 | P.O. Box 357 |
| Davis, LLP | | Lawrenceburg, TN 38464 |
| 511 Union Street, Suite 2100 | | |
| Nashville, Tennessee 37219-1760 | | |

this the 14th day of March, 2011.

/s/ John A. Beam, III