UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| VELMA SUE BATES, CLAUDIA BIRDYSHAW, WILLARENE FISHER, MARK LONG, JON TOUNGETT, CAROLYN WADE, and RICHARD WHITE, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:08-0029 Judge Trauger |
| v. | ) ) | |
| DURA AUTOMOTIVE SYSTEMS, INC., | ) ) | |
| Defendant. | ) | |

# MEMORANDUM

Pending before the court is the Plaintiffs' Motion for Summary Judgment on the Issue of Medical Exam (Docket No. 101), to which the defendant, Dura Automotive Systems, Inc. ("Dura"), has responded (Docket No. 109), and the plaintiffs have filed a reply in support (Docket No. 114). Also pending is Dura's Second Motion for Summary Judgment (Docket No. 103), to which the plaintiffs have responded (Docket No. 111), and the defendant has filed a reply in support (Docket No. 113). In responding to the plaintiffs' Motion for Summary Judgment on the Issue of Medical Exam, the defendant has also made a Cross-Motion for Summary Judgment on the same issue. (*See* Docket No. 108). The plaintiffs' reply in support of its motion also operates as a response to the defendant's Cross-Motion for Summary Judgment. (Docket No. 114). As discussed herein, all pending motions will be denied.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

As the court stated in its December 15, 2010 Memorandum that ruled on the plaintiffs'

1

Motion to Reconsider:

The plaintiffs are former Dura employees who worked at Dura's Lawrenceburg, Tennessee manufacturing Facility, and who were all terminated by Dura. In early 2007, managerial officers at the Facility became increasingly concerned that legal and illegal drug use at the Facility was leading to a significantly higher rate of workplace accidents than at comparable plants. Therefore, in early 2007, Dura contacted an independent, third-party drug testing organization known as Freedom From Self ("FFS"), which would assist Dura in implementing a new, comprehensive drug testing program. Dura decided that its new drug-testing program for the Facility would test for twelve substances, including those readily found in legal prescription drugs.

In May 2007 Facility-wide drug testing of the Facility's more than 450 employees was conducted. Each employee registered with an FFS representative who handed the employee a cup, and the employee went into a controlled environment to urinate in the cup. After so doing, the employee would deliver the cup back to the FFS representative. At this time, the FFS representative conducted an "initial panel test," which made a preliminary finding as to whether the urine contained any of the twelve substances.

FFS sent each employee's positive urine sample to Quest Diagnostics, for confirmatory testing. Quest then sent the results of the confirmatory tests to Dr. Seth Portnoy, who reviewed the confirmatory test results. If Dr. Portnoy saw that an employee tested positive for a substance found in legal prescription drugs, he would contact the employee to determine if there was a medical explanation for the positive result. If the employee provided a valid medical explanation, Dr. Portnoy changed the final, confirmed result of the drug test from "positive" to "negative."

From Dura's perspective, however, all of this confirmatory testing was essentially irrelevant. If an employee failed the initial panel test, Dura ordered the employee to meet with FFS and present to FFS a list of all of the prescription medications that the employee was taking. After meeting with the employee, FFS sent Dura the employee's list of prescription medications and the warnings associated with them. Dura representatives then determined, for each employee, which of the medications listed had warnings about the operation of equipment or machinery or impaired mental alertness while using the medication ("adverse warnings"). Identifying these medications as prohibited, Dura then sent the employee a letter advising that Dura was placing the employee on a thirty-day leave of absence, to allow the employee an opportunity to transition to other drugs that Dura perceived as less risky or to stop using the drugs altogether.

This policy was utterly inflexible. Several employees (plaintiffs in this case) obtained letters from their physicians stating that the employee's medications would not affect work performance and were necessary for the employee's health and functioning. These letters had no effect on Dura's treatment of the matter. Dura's policy was any employee,

regardless of age or health status, taking drugs for any reason that carried warnings about the operation of equipment or machinery or impaired mental alertness were not allowed to work at Dura until he/she discontinued use of the prohibited drug. An employee's compliance with prescription drug rules was confirmed by subsequent initial panel tests; an employee was usually terminated following a second, failed initial panel test.[1]

Each of the seven plaintiffs are former Dura employees who, at one time or another, failed an initial panel test because he or she was taking a legally prescribed prescription drug that contained one of the twelve banned substances. Each of the plaintiffs' "positive" initial panel tests was later reversed by Dr. Portnoy to a "confirmed negative," due to the plaintiffs' documented medical need for the prescription drugs.[2]

After an analysis of the facts and law, the court dismissed the vast majority of the plaintiffs' claims. The court found that, with the exception of plaintiff Fisher, the plaintiffs were not disabled as a matter of law and could not pursue ADA claims that required an initial showing of disability. Plaintiff Fisher, however, had raised a fact issue as to whether she was terminated because she had a "record of" disability at Dura and, therefore, she could bring that claim (under the ADA and Tennessee Disability Act) to a jury. The court also dismissed the plaintiffs' state law claims.

The remaining issue was whether the plaintiffs, despite not having a disability, could maintain a claim against Dura based upon the drug testing and evaluations that they were subjected to in the workplace.
(Docket No. 97 at 1-4)(internal citation and quotation omitted).

After further briefing before this court and an interlocutory appeal to the Sixth Circuit followed by additional briefing, this court, in its December 15, 2010 Memorandum, concluded that the plaintiffs could all proceed with Section 12112(d)(4)(A) claims against Dura, even though only Fisher has a viable claim that she was "disabled" under the ADA. (*Id.* at 9-12.) Section 12112(d)(4)(A) states that "a covered entity shall not require a medical examination and

---

[1] In the summer of 2007, Dura also implemented random and "post layoff return to work" drug screening. If any employee failed an initial panel test during a random or "post layoff return to work" drug screening, the employee could be immediately terminated. (Docket No. 112 at 6-7.)

[2] For convenience purposes, the specific circumstances of each plaintiff's testing are discussed in conjunction with the analysis of the defendant's "proximate cause" summary judgment motion.

shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The court concluded that "the initial panel test and the follow-up interview could be viewed as a 'medical examination' under the ADA," and that, applying the relevant case law, Section 12112(d)(4)(A) "can certainly be reasonably read to suggest that urinalysis and similar testing – outside of testing for illegal drugs – constitutes a medical examination under the ADA." (Docket No. 97 at 12.)

The court set this case for a July 12, 2011 trial. (Docket No. 100). Now, without further development of the factual record, both sides have filed additional summary judgment motions. (*See generally* Docket No. 112 and 115).

## ANALYSIS

### I. Standard of Review

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving party shows that there is no genuine issue of material fact as to at least one essential element of the non-moving party's claim, the burden shifts to the non-moving party to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [non-moving

party]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the non-moving party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.     Dura's Motion for Summary Judgment on Issue of Proximate Cause

The defendant argues that, even if the plaintiffs were subjected to an impermissible "medical examination," the defendant is still entitled to summary judgment because "the initial panel test and the follow-up interview were not the proximate cause of any harm to any Plaintiff." (Docket No. 104 at 1.) The defendant points to a series of cases in which circuit courts have held that "the plaintiff in an ADA medical examination/inquiry case must show" a violation of the ADA and a "resulting injury in fact." (*Id.* at 8 citing *e.g. Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 519-20 (3rd Cir 2001)(finding required injury may be "emotional, pecuniary, or otherwise"); *Cossette v. Minn. Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999)(finding "some sort of tangible injury" from the testing is required); *Armstrong v. Turner Indus. Inc.*, 141 F.3d 554, 562 (5th Cir. 1998)(injury must be "cognizable").

The defendant takes each plaintiff in turn, arguing that, on the undisputed facts, any injuries suffered by that individual were "wholly unrelated" to the challenged testing. (*See* Docket No. 104 at 5.)

5

– As to plaintiff Bates, she "failed the May 2007 facility-wide initial panel test, was placed on a thirty-day leave of absence, returned to work, and then passed the second test on June 18, 2007." (*Id.*)  After a voluntary layoff, in October 2007, she failed the "post layoff return to work test," which resulted in her termination. (*Id.*)(internal citation omitted)

– As to plaintiff Fisher, she "had been on leave of absence for various immaterial reasons when she returned to work at Dura in June 2007.  She failed her 'return from leave' test, but, following a thirty-day leave of absence, passed and was allowed to return to work.  She then worked until September 2007.  At that time, in conjunction with a larger layoff, which was unrelated to any drug testing, Fisher was laid off." (*Id.* at 6.)(internal citation omitted)

– As to plaintiff Toungett, he "passed the facility-wide drug test in May 2007. He then worked until August 2007.  At that time, Toungett failed a random drug test.  He was terminated for failing the random drug test, which was unrelated to the May 2007 facility-wide testing." (*Id.*)(internal citation omitted)

– As to plaintiff Wade, she "failed the May 2007 facility-wide drug test and was placed on a thirty-day leave of absence.  Her subsequent tests were 'clean,' and . . . approximately a year later, Wade was terminated for 'reasons unrelated to her May 2007 positive initial panel test'" (*Id.* quoting Docket No. 77 at 9-10.)

– As to plaintiff Birdyshaw, she "failed the May 2007 initial panel test and was placed on a thirty-day leave of absence.  In June 2007, she again tested positive for a prohibited substance.  As noted by the Court, 'Birdyshaw was subsequently terminated for failing to submit a clean initial panel test.'" (*Id.* quoting Docket No. 77 at 7.)

– As to plaintiff Long, he "failed both the May 2007 test and another test conducted in July 2007.  After a thirty-day leave, Long failed the 'return to work' panel test and was placed on indefinite layoff status in August 2007.  He was then terminated six months later when it expired." (*Id.* at 7.)

– As to plaintiff White, he  "failed the May 2007 test, was placed on the thirty-day leave of absence, and then failed the second test.  He was then placed on a six-month layoff and ultimately terminated on December 19, 2007." (*Id.*)

As to Bates, Fisher, Toungett, and Wade, the defendant argues that they were terminated "for a reason wholly unrelated to any alleged 'medical examination or inquiry' – the May 2007 drug test and the follow-up interview." (*Id.* at 9.)  That is, both Wade and Fisher were laid off in

6

conjunction with broader layoffs unrelated to drug testing and Bates and Toungett were terminated for failing a random or "post layoff" drug test, which, according to the defendant, does not constitute "any kind of 'medical examination or inquiry' whatsoever." (*Id.*)

As to Birdyshaw, Long, and White, the defendant argues that they were "terminated only after failing to submit a clean panel test following their respective thirty-day leaves of absence, long after the plant wide testing. Accordingly, the decision to terminate each of them – and their alleged damages flowing therefrom – is tied only to their inability to pass a drug test, not because of a purportedly improper 'medical examination or inquiry.'" (*Id.* at 10-13.)

The defendant's argument – that the plaintiffs' case fails because they did not show *any* injury as a result of the drug testing – is without merit. First, as the plaintiffs note, all plaintiffs (except for Toungett) were subject to (at least) an unpaid leave of absence as the result of their initial failed drug test/FFS meeting, and a reasonable jury could conclude that this loss of wages constitutes an "injury" as the result of the drug testing, along with any emotional or physical damages that certain plaintiffs may have sustained from no longer taking the drugs prescribed to them in order to continuing working. (Docket No. 111 at 3-12.)

Moreover, the defendant's attempt to limit the scope of plaintiffs' potential damages to those emanating directly from the May 2007 initial round of drug testing is misplaced. As the court stated in the December 15, 2010 Memorandum, Section 12112(d)(4)(A) "can certainly be reasonably read to suggest that urinalysis and similar testing – outside of testing for illegal drugs – constitutes a medical examination under the ADA" and that case law suggests that "testing for legal drugs constitutes a medical examination." (Docket No. 97 at 12.) Therefore, any drug testing endured by the plaintiffs here could form the basis for a claim, and the defendant's

7

assertion that the plaintiffs have only complained about the direct fallout from the May 2007 testing is simply incorrect. For instance, the Complaint discusses Toungett's August 2007 "post layoff" test and subsequent termination in detail. (Docket No. 28 at 15.) While every plaintiff's damages will be unique, there is sufficient evidence in the record to show that each plaintiff has a reasonable claim for some degree of damage. Therefore, the defendant's Second Motion for Summary Judgment will be denied.[3]

### III.    Summary Judgment Motions on "Medical Exam" Issue

As noted above, aside from plaintiff Fisher, the sole remaining claim for the plaintiffs is under Section 12112(d)(4)(A) of the ADA. Again, that provision states that, "a covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The court has already determined that the matter of whether the inquiries or examinations in this case were "job-related and consistent with

---

[3] The defendant also argues that the "plaintiffs lack standing to pursue injunctive or declaratory relief." (Docket No. 104 at 13.)   In the Amended Complaint, the plaintiffs seek a series of declarations that the conduct about which they have complained is unlawful and an injunction prohibiting the defendant from engaging in similar conduct going forward. (Docket No. 28 at 28-29.) The defendant argues that, given that it appears unlikely that any plaintiff will again seek to work at Dura, prospective relief is inappropriate. (Docket No. 104 at 14-15.) In response, the plaintiffs generally argue that they have standing to proceed with this case. (Docket No. 111 at 24-28.) Given that, as discussed herein, this case will proceed to trial on the plaintiffs' ADA claims, it is not necessary to rule, at this juncture, whether the plaintiffs are appropriately seeking declaratory and injunctive relief. If, at trial, the plaintiffs seek such relief, the court will evaluate its propriety at that time.

business necessity" is an issue for the jury. (Docket No. 77 at 28.)[4]

The issue for this round of summary judgment briefing, then, is whether the plaintiffs were or were not subject to a "medical examination" or a "disability-related inquiry." While, in the December 15, 2010 Memorandum, the court ruled that the plaintiffs could proceed to trial with a Section 12112(d)(4)(A) claim, both sides now argue that this issue can be determined as a matter of law. (Docket No. 97 at 13.)

The plaintiffs argue that both the "substance test administered to the plaintiffs" and the FFS inquiry, done at the behest of the defendant "into the list of all medications taken by the Plaintiffs," were "medical examination[s]" and "disability-related inquir[ies] as a matter of law." (Docket No. 102 at 5.). In support, the plaintiffs file EEOC compliance and enforcement materials published by the EEOC Office of Legal Counsel in 2000, which seek to further define these terms with the aid of statutes, regulations, and case law. (Docket No. 102 Ex. 1.)

The compliance materials define a "medical examination" as any procedure or test that "seeks information about an individual's physical or mental impairments or health," and includes as examples "blood, urine, and breath" analyses for legal substances, such as alcohol. (*Id.* at 6.)

---

[4]Therefore, the plaintiffs' continued argument that the court should find, as a matter of law, that the inquiries or examinations were not "job related" nor "consistent with business necessity" is misplaced. (*See* Docket No. 102 at 8-12.) The court recognizes that the EEOC compliance materials filed by the plaintiffs suggest that such broad inquiries into prescription drug use are "generally" not "consistent with business necessity." (Docket No. 102 Ex. 1 at 12.) However, as stated by the court almost two years ago, when it considered this issue, "Dura has brought forth evidence that the Facility is a somewhat dangerous place to work, had significant, drug-related safety issues and that Dura attempted to screen out only those drugs that, it believed, could cause impairment. In light of that evidence, the fact that 'workplace safety' is a 'business necessity,' and the fact that businesses must retain ample discretion in how they structure on-site medical screenings in connection with 'business necessities,' the court cannot say, as a matter of law, that Dura's policy was not 'consistent with business necessity.' This is a question for the jury." (Docket No. 77 at 27-28.)

Additionally, a "disability related inquiry" is defined as a question or questions that is/are "likely to elicit information about a disability." (*Id.* at 5.)

While, as discussed in the December 15, 2010 Memorandum, the ADA explicitly removes a test for illegal drugs from the ambit of a "medical examination," the plaintiffs argue that the limited case law on this issue suggests that a test that would potentially sanction legal (along with illegal) prescription drug use, as was used here, constitutes a "medical examination" under the ADA. *See* 42 U.S.C. § 12114(d); *Connolly v. First Personal Bank*, 623 F. Supp.2d 928, 931 (N.D. Ill. 2008)("the exemption for drug testing was not meant to provide a free peek into a prospective employee's medical history"); *see also cf. Meyer v. Qualex*, 388 F. Supp.2d 630, 637 (E.D. N.C. 2005)(finding drug test was not a "medical examination" because the evidence showed that the test was for illegal drugs).

The defendant responds that its protocol cannot constitute a "medical examination" or a "disability related inquiry," because the "EEOC itself . . . both approves and endorses precisely the same drug testing methodology and procedure about which Plaintiffs complain." (Docket No. 109 at 2.) In support, the defendant files its own set of EEOC compliance and guidance materials. (Docket No. 109 Exs. A& B.)

Specifically, the defendant points to 1995 "enforcement guidance" from the EEOC Office of Legal Counsel, which states that an employer may ask its employees about "lawful drug use if the employer is administering a test for illegal use of drugs." (Docket No. 109 Ex. B. at 5.) Indeed, an "employer may validate the test results by asking about lawful drug use or possible explanations for the positive result other than the illegal use of drugs." (*Id.*) The defendant argues that, because its protocol called for a test of illegal drugs combined with follow up

10

questioning to explain positive results, its protocol cannot run afoul of the ADA. (Docket No. 109 at 8.)

The defendant's reliance on the EEOC compliance materials is misplaced. First, the EEOC's broad definition of "medical examination" (which includes a urine test for legal substances, such as alcohol) suggests that, at least as far as the EEOC is concerned, the plaintiffs here were all subject to a "medical examination." (Docket No. 102 Ex. 1 at 6.) Moreover, the defendant takes the provision permitting an employer to ask employees about "lawful drug use if the employer is administering a test for illegal use of drugs" out of context. Indeed, on the same page, the EEOC guidance states that an employer may not "ask applicants about their lawful drug use," because this is a "disability-related" inquiry.[5] (Docket No. 109 Ex. B at 5.) Under the EEOC guidance, a question regarding lawful drug use is only appropriate if the "applicant tests positive for illegal drug use." (*Id.*) At this point, the employer, looking after the interest of his employee, may ask additional questions in order to "validate the test results" or to seek out other "possible explanations . . . other than the illegal use of drugs." (*Id.*)

As far as the plaintiffs here are concerned, the defendant's questioning following positive test results was not, however, to "validate the test results" or seek out other "possible

---

[5]In a footnote in the December 15, 2010 Memorandum, the court stated, "[t]he plaintiffs point to the 'EEOC Enforcement Guide,' which states that a 'disability-related inquiry' may include inquiries about prescription drug use. Again, because Dura's general focus was on the feared consequences that the drugs would have on its employees – not on the underlying malady – the inquiries prong does not appear to be a good 'fit' for the facts of this case." (Docket No. 97 at 11)(internal citation omitted). Based on the court's review of the record and the unique facts of this case, it remains questionable whether the evidence at trial will show that Dura's questioning was designed to or did elicit information about disabilities. However, as discussed herein, the evidence adduced at trial will determine the ultimate applicability of these terms to each plaintiff.

11

explanations." Rather, the additional questioning was designed to determine the full list of *legal* prescription drugs that the plaintiff was taking. The EEOC guidance does not, in any way, suggest that the defendants' protocol was consistent with the strictures of the ADA; indeed, the guidance explicitly states that such questioning about lawful drug use is not permitted under the ADA.

Clearly, the defendant's motion for summary judgment on this point should be denied. The remaining issue is whether the court, at this stage, should conclude, as a matter of law, that any or all of the plaintiffs were subject to a "medical examination" or a "disability related" inquiry. There is no doubt that, as all plaintiffs were subject to at least one initial panel test and, with the exception of Toungett, at least one meeting with FFS officials (at the behest of the defendant), the plaintiffs have a very strong argument that they were, at least, subjected to a "medical examination" under the broad, common sense definition of the term embraced by the EEOC. However, given that this matter will proceed to trial in any event and that the proof at trial will undoubtedly be the same in any event, there is no reason for the court to conclusively determine this matter at this time. The evidence at trial should clearly show the specific testing, questioning, and analysis to which each individual plaintiff was subjected, and, based on this evidence, if appropriate at the close of the trial, the court will instruct the jury on any findings that it makes as a matter of law.

## CONCLUSION

For the reasons discussed herein, all pending motions will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge